

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-3-1998

# IMO Ind Inc v. Kiekert AG

Precedential or Non-Precedential:

Docket 97-5356

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"IMO Ind Inc v. Kiekert AG" (1998). *1998 Decisions.* Paper 215.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/215

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 3, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5356

IMO INDUSTRIES, INC.
Appellant

v.

KIEKERT AG
Appellee

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 96-cv-05881)

Argued: January 22, 1998

Before: BECKER,* STAPLETON, Circuit Judges,
and POLLAK, District Judge.**

(Filed September 3, 1998)

ROBERT G. SUGARMAN, ESQUIRE
  (ARGUED)
GERALD A. STEIN, ESQUIRE
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

_____

*Honorable Edward R. Becker, United States Circuit Judge for the Third
Circuit, assumed Chief Judge status on February 1, 1998.

**Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

GERALD KROVATIN, ESQUIRE
Arseneault & Krovatin
560 Main Street
Chatham, NJ 07928

Attorneys for Appellant
IMO Industries

PETER BARNES, ESQUIRE
 (ARGUED)
FRANZ M. OPPENHEIMER,
 ESQUIRE
BARBARA M. TAPSCOTT, ESQUIRE
Swidler & Berlin, Chartered
3000 K Street, NW
Suite 300
Washington, DC 20007-5116

DOUGLAS S. EAKELEY, ESQUIRE
NEIL P. HORNE, ESQUIRE
Lowenstein, Sandler, Kohl,
 Fisher & Boylan
A Professional Corporation
65 Livingston Avenue
Roseland, NJ 07068

Attorneys for Appellee
Kiekert A.G.

OPINION OF THE COURT

BECKER, Chief Judge.

This is a long arm service of process case which requires us, for the first time, to apply the Supreme Court's decision in Calder v. Jones, 465 U.S. 783 (1984), to a business tort. It comes before us on the appeal of the plaintiff, Imo Industries Inc. ("Imo"), a multinational corporation with its principal place of business in New Jersey, from an order of the district court dismissing its action pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction over defendant Kiekert AG ("Kiekert"), a German corporation. The complaint alleges that Kiekert tortiously interfered with

2

Imo's attempt to sell its wholly-owned Italian subsidiary to a French corporation that was one of Kiekert's competitors. The asserted mechanism by which the tort was accomplished was a series of letters sent by Kiekert to the Italian subsidiary and to the New York investmentfirm of C.S. First Boston, Imo's representative in the sale, threatening that Kiekert would revoke the licensing agreement it had with the subsidiary if the deal went through. According to Imo, the sale was never consummated because of these threats, causing it considerable loss.

Imo contends that personal jurisdiction over Kiekert was proper based upon its contacts with Imo in New Jersey and upon Kiekert's claimed commission of an intentional tort, the effects of which were allegedly felt by Imo in New Jersey. Because we conclude that Kiekert's contacts with the forum would not otherwise satisfy the requirements of due process, the question whether personal jurisdiction can be exercised here depends upon the applicability to the facts of Calder, in which the Supreme Court found personal jurisdiction to be proper over nonresident defendants that committed an intentional tort outside the forum, the unique effects of which caused damage to the plaintiff within the forum. We believe that for Calder to apply, the plaintiff must allege facts sufficient to meet a three-prong test. First, the defendant must have committed an intentional tort. Second, the plaintiff must have felt the brunt of the harm caused by that tort in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort. Third, the defendant must have expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

Applying this test to the present facts, we conclude that personal jurisdiction does not exist here since Imo has not pointed to sufficient facts demonstrating that Kiekert "expressly aimed" its tortious conduct at New Jersey. To the contrary, the focus of the dispute -- i.e. the proposed sale of an Italian company to a French company and a claim of rights by a German company pursuant to a license agreement apparently governed by German law -- and the

3

alleged contacts by Kiekert (i.e., its correspondence) all appear to be focused outside the forum. The order of the district court will therefore be affirmed.

I. Facts and Procedural History

For purposes of this appeal, we accept the plaintiff 's allegations as true. See Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 142 (3d Cir. 1992) (holding that an appellate court reviewing an order of the district court dismissing a case for lack of personal jurisdiction"must accept all of the plaintiff 's allegations as true and construe disputed facts in favor of plaintiff.") (citing In re Arthur Treacher's Franchisee Litigation, 92 F.R.D. 398, 409–10 (E.D. Pa. 1981)). However, the plaintiff bears the burden of proving that personal jurisdiction is proper. Carteret Savings Bank, 954 F.2d at 146 (Once a defendant raises the defense of lack of personal jurisdiction, "the plaintiff bears the burden to prove, by a preponderance of evidence, facts sufficient to establish personal jurisdiction.") (citing Time Share Vacation v. Atlantic Resorts, Ltd., 735 F.2d 61, 65 (3d Cir. 1984)).

Defendant Kiekert, a manufacturer of automobile door latch systems, is a corporation organized, existing under the laws of, and having its principal place of business in the Federal Republic of Germany. Kiekert sells its products world-wide, though only 2% of its sales derive from the United States market.1 According to Kiekert, it does not now engage, nor has it ever engaged in any of the following activities in New Jersey: "the manufacture of any products; any direct sales; solicitation or advertisement to sell its products; any shipment of merchandise directly into or through the state, or the supply of services there; the maintenance of an office, a mailing address, a telephone number, or a bank account; the ownership of any real or personal property; the employment of any employees or agents; or the requirement of or payment of taxes."

_____

1. Kiekert's promotional literature projects that the United States market will comprise thirty percent of its sales by the year 2000. Since this is but a projection, it does not affect the outcome here.

4

Appellee's Br. at 4. Imo does not appear to dispute these claims.

Plaintiff Imo, a multinational corporation, is incorporated in Delaware with its principal place of business in Lawrenceville, New Jersey. Imo has 22 manufacturing facilities around the world, including plants in Germany, the United Kingdom, France and Australia. Approximately 90% of Imo's products are marketed outside of the United States, and approximately 34% of Imo's total net sales for 1995 were in these foreign markets. Most relevant to the present case is the fact that Imo owns all of the shares of an Italian company, Roltra Morse, S.p.A. ("Roltra"), which manufactures automobile door latches using technology licensed from Kiekert. The licensing agreement was negotiated in Germany and Italy in 1993 and it provides that the agreement shall be governed by German law. Imo was not a party to this licensing agreement and did not participate in the negotiation or execution thereof.

In December 1995, Imo decided to sell its shares in Roltra and retained the New York investment firm of C.S. First Boston Corporation ("First Boston") to act as its representative. On Imo's behalf, First Boston solicited bids from corporations interested in acquiring Imo's shares of Roltra. Valeo, S.A. ("Valeo"), a French corporation and one of Kiekert's competitors, submitted a bid of $72 million for the shares. Kiekert also submitted a bid, though for only $30 million. Imo and Valeo thereafter proceeded to prepare final agreements to close the sale of Roltra's stock for $69 million, and Kiekert was notified on or about June 12, 1996, that its bid was insufficient.

Shortly thereafter, and prior to closing, Kiekert sent a letter to First Boston in New York stating that, under its agreement with Roltra, Kiekert had the right to revoke its license for the door latch technology if Roltra's shares were sold to one of its competitors. More specifically, the letter to First Boston, dated June 17, 1996, stated in pertinent part that "Kiekert's license and patents . . . cannot be transferred if [Roltra] is taken over by one of our competitors" and if this occurs, Kiekert "would have to retire [its] acceptance of production for these products immediately which are manufactured under our license."

5

The import of such an action was clear -- if the license was revoked, Roltra's value as a going concern would be severely impacted. In addition, Kiekert wrote to Roltra in Italy on July 8, 1996, similarly stating Kiekert's intent to terminate the licensing agreement if Roltra's shares were sold to a competitor.

First Boston forwarded the June 17 letter to Imo in New Jersey. Imo responded directly to Kiekert by letter dated July 9, 1996, stating its position that Kiekert was"not entitled by contract or law to rescind or otherwise terminate the License Agreement in the event of sale of the shares to any third party." Imo demanded "that [Kiekert] cease and desist from making such statements to any third party," and advised that if it "continue[s] to make such statements [it] . . . will be held responsible for all damages that [Roltra] and/or its shareholders suffer from such representations." Roltra also forwarded the July 8 letter to Imo in New Jersey. Imo again responded directly to Kiekert by letter dated August 12, stating that its "tortious and illegal conduct is seriously jeopardizing [our] ability to close this transaction," and that "unless you immediately withdraw your threats of termination, we are prepared tofile lawsuits in all appropriate jurisdictions, including the United States . . ."

In addition to the mail contacts, Kiekert officials in Germany and Imo officials in New Jersey spoke twice by telephone during this time concerning the license agreement. The record reveals that representatives of Imo initiated these calls. See Appellant's Br. at 21. Finally, Imo requested meetings with Kiekert in an attempt to resolve the matter. One such meeting was held in Toronto on August 27, 1996, and two more were held on September 10 of that year in Germany. These discussions apparently failed to persuade Kiekert to change its position.

On October 28, 1996, Valeo advised Imo of its withdrawal from negotiations concerning the sale of Roltra's shares. By letter, it informed Imo that "[w]e have concluded that, irrespective of the likelihood that Kiekert's position would prevail, Kiekert's position regarding its license can be expected to have a disruptive impact on the business of

Roltra . . . and in particular create disturbances with customers during the period of any litigation."

Imo thereafter sued in the District Court for the District of New Jersey, alleging that Kiekert's actions constituted tortious activity and caused significant damage to it in New Jersey. Subject matter jurisdiction was premised on diversity of citizenship. See 28 U.S.C.S 1332. According to Imo, Valeo's decision to break off the contract negotiations was directly caused by Kiekert's steadfast assertion of its intent to revoke its license if the proposed sale was consummated. As a result, Imo alleges that it has suffered injuries in numerous forms due to its inability to consummate the deal. First, Imo alleges that the sale to Valeo would have resulted in a profit of more than $20 million. Second, Imo submits that, because of its inability to sell the Roltra shares, it has been forced to reclassify Roltra as a continuing operation, with a concomitant restatement of its third quarter earnings. This has allegedly resulted in the reversal of a favorable $10 million tax benefit based on the anticipated sale, the recognition of $4.8 million in previously deferred 1996 losses relating to Roltra, liabilities for banking and legal fees, as well as the diminution of Roltra's stock value. See Appellant's Br. at 9.

Kiekert moved to dismiss Imo's action for lack of personal jurisdiction, contending that it did not have the requisite minimum contacts with New Jersey to sustain jurisdiction in that forum. The district court granted the motion. We review de novo the district court's dismissal for lack of personal jurisdiction. Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147, 150 (3d Cir. 1996) ("Whether personal jurisdiction may be exercised over an out-of-state defendant is a question of law, and this court's review is therefore plenary."); Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).

II. Due Process Limits on the Exercise of Personal Jurisdiction

The fundamental principles of long arm jurisdiction are extremely familiar and, since they have been repeated countless times in the jurisprudence, little will be served by

7

rescribing them at any length here. In brief, to exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry. First, the court must apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction; then, the court must apply the precepts of the Due Process Clause of the Constitution. In New Jersey, this inquiry is collapsed into a single step because the New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process. See DeJames v. Magnificence Carriers, Inc., 654 F.2d 280, 284 (3d Cir. 1981). This being the case, the New Jersey Supreme Court has made it clear that New Jersey courts look to federal law for the interpretation of the limits on in personam jurisdiction. Mesalic v. Fiberfloat Corp., 897 F.2d 696, 698 n.5 (3d Cir. 1990).

Personal jurisdiction under the Due Process Clause depends upon "the relationship among the defendant, the forum, and the litigation." Shaffer v. Heitner, 433 U.S. 186, 204 (1977). Physical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). Instead, the plaintiff must show that the defendant has purposefully directed its activities toward the residents of the forum state, see id. at 472, or otherwise "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." See Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Where, as here, the plaintiff 's cause of action is related to or arises out of the defendant's contacts with the forum, the court is said to exercise "specific jurisdiction." See Helicopteros Nacionales de Columbia, S.A. v. Hall , 466 U.S. 408, 414 n.8 (1984).2 In order for specific jurisdiction to be
_____

2. If the plaintiff 's claim does not arise out of the defendant's contacts with the forum, the court is said to exercise "general jurisdiction." See Helicopteros, 466 U.S. at 414 & n.9. To establish general jurisdiction over a defendant, the contacts must be shown to be"continuous and systematic". See id. at 416. Imo does not contend that the New Jersey courts could exercise general jurisdiction over Kiekert.

8

properly exercised under the Due Process Clause, the plaintiff must satisfy a two-part test. First, the plaintiff must show that the defendant has constitutionally sufficient "minimum contacts" with the forum. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985). Second, for jurisdiction to be exercised the court must determine, in its discretion, "that to do so would comport with`traditional notions of fair play and substantial justice.' " See Vetrotex, 75 F.3d at 150-51 (citing International Shoe Co. v. Washington, 326 U.S. 310 (1945)). Although this case raises some interesting issues regarding the application of the "fair play and substantial justice" standard, we need not reach them since, as we discuss below, Imo has not met its burden of demonstrating Kiekert's minimum contacts with the forum.

We note initially that specific jurisdiction will not lie here on the basis of Kiekert's alleged contacts with the forum alone, for (as we detail in the margin) they are far too small to comport with the requirements of due process. 3 Since

(Text continued on page 11)

_____

3. In brief, Imo argues that specific jurisdiction can be premised on the following contacts: (1) the June 17 letter from Kiekert to First Boston; (2) the July 8 letter from Kiekert to Roltra; (3) the two phone calls from Imo's general counsel in New Jersey to Kiekert; and (4) the August and September face-to-face meetings in Toronto and Germany. Although neither of Kiekert's letters were sent to New Jersey, Imo asserts that Kiekert "certainly knew" that its correspondence would both be transmitted to Imo in New Jersey and cause injury to Imo there. Appellant's Br. at 19. Similarly, Imo contends that Kiekert knew that the face-to-face meetings, though occurring outside the United States, would result in injury to Imo in New Jersey.

We believe that these contacts, considered as a whole, are insufficient to demonstrate, even at a minimal level, that Kiekert has purposefully directed its activities toward the forum or has purposefully availed itself of the privilege of conducting its activities within the forum. The weight of authority among the courts of appeal is that minimal communication between the defendant and the plaintiff in the forum state, without more, will not subject the defendant to the jurisdiction of that state's court system. For instance, this court in Carteret Savings Bank, 954 F.2d at 149, noted that "some minimal correspondence alone will not satisfy minimum contacts." This conclusion has been reached by a number of the other circuits, and we respect the weight of this authority. See, e.g.,

9

Stover v. O'Connell Associates, Inc., 84 F.3d 132, 137 (4th Cir.), cert. denied ___ U.S. ___, 117 S. Ct. 437 (1996) ("Ordering a product or service by telephone from a company in a different state does not subject the customer to that state's jurisdiction."); Far West Capital, Inc. v. Towne, 46 F.3d 1071, 1077 (10th Cir. 1995) ("It is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts."); Reynolds v. Int'l Amateur Athletic Fed., 23 F.3d 1110, 1119 (6th Cir. 1994) ("The use of interstate facilities such as the telephone and mail is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process.") (quoting Scullin Steel Co. v. National Railway Utilization Corp., 676 F.2d 309, 314 (8th Cir. 1982) (internal quotation marks omitted)); Cote v. Wadel, 796 F.2d 981, 984 (7th Cir. 1986) (finding insufficient a "handful" of letters and phone calls exchanged between plaintiff and defendant).

In the present case, not only are the communications limited in quantity, but there is not even one direct act of "entry" into New Jersey by Kiekert -- the letters were sent to Italy and New York, the phone calls were placed by Imo itself, and the meetings were held in Canada and Germany. While in some cases there might be merit to the argument that correspondence sent to a third-party outside the forum which foreseeably would wind up within the forum could weigh in favor of a finding of specific jurisdiction being properly exercised, in the present case we are not persuaded that the Kiekert letters provide such weight. The same must be said for the two phone calls, which strike us as purely unilateral conduct by Imo. See Hanson, 357 U.S. at 253 ("[T]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

There is also an aspect of foreseeability that we believe is missing in this case. The Supreme Court has concluded that "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause . . . . [T]he foreseeability that is critical to due
process analysis is . . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295-97 (1980) (internal quotation marks omitted). We do not believe that it was reasonably foreseeable to Kiekert that its connection with New Jersey was such that that it should reasonably have anticipated being haled into court there. From Kiekert's perspective, it entered into a License Agreement with an Italian company in Germany, which was to be governed by German law. Imo took no part at all in these contract negotiations. It was perfectly reasonable,

10

this is an intentional tort case, we must consider whether the application of Calder v. Jones, supra, can change the outcome. Generally speaking, under Calder an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the "minimum contacts" prong of the Due Process test is satisfied. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984). We therefore concentrate our minimum contacts discussion below on the Calder test.

III. The Import of Calder v. Jones

A. The Calder Holding

In Calder, entertainer Shirley Jones brought an action in California against the author and editor of an article which had appeared in the National Enquirer, and which she claimed was defamatory. The article alleged that Jones had a problem with alcohol which prevented her from fulfilling her professional obligations. Although the Enquirer was distributed nationally, it had its largest circulation in California. Defendant South, the reporter, did most of his research in Florida, relying on phone calls to California for information. Defendant Calder had no such contacts with California. He reviewed and approved the initial evaluation of the topic of the article and edited drafts to itsfinal form. See id. at 785–86. Both defendants, residents of Florida, moved to dismiss Jones' suit for lack of personal jurisdiction.

The Court found that the exercise of personal jurisdiction over the defendants was proper. The Court concluded:

> The allegedly libelous story concerned the California
> activities of a California resident. It impugned the
> professionalism of an entertainer whose television
> career was centered in California. The article was
> drawn from California sources, and the brunt of the

_____

therefore, for Kiekert to believe when it entered into the agreement, that it would be able to enforce its rights under the contract without being subject to the jurisdiction of the New Jersey courts.

11

harm, in terms of both respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California. . . . [T]heir intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation.

Id. at 788-90 (footnote omitted). It is from this passage that courts have drawn what has come to be known as the Calder "effects test." We have observed that under this test a court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by certain acts outside the forum which have a particular type of effect upon the plaintiff within the forum. See Carteret Savings Bank, 954 F.2d at 148.4 Imo argues that the present case falls within Calder's purview because Kiekert "set upon a deliberate and intentional course designed to prevent Imo from selling Roltra to one of Kiekert's competitors," and because "Kiekert's tortious conduct was specifically aimed at and caused injury to Imo (a New Jersey resident) within the State of New Jersey." Appellant's Br. at 15. We disagree.

B. Calder and Business Torts

Calder's holding cannot be severed from its facts. In order to reach the conclusion that jurisdiction was properly exercised by the California court in that case, the Supreme Court relied on three principal findings. First, the defendant committed an intentional tort. Second, the forum was the focal point of the harm suffered by the plaintiff as a result of that tort. Third, the forum was the focal point of

_____

4. We note that the interpretation of Calder in Carteret Savings Bank was not necessary to our holding, and was therefore dicta.

12

the tortious activity in the sense that the tort was "expressly aimed" at the forum. Essential was a corollary finding that the defendants knew that the "brunt" of the injury caused by their tortious acts would be felt by the plaintiff in the forum. In applying Calder outside the defamation context, courts have adopted varying versions of these factors as the "effects test," yielding a mixture of broad and narrow interpretations. Since we have not applied Calder to a case involving business torts, we turn to a subset of these cases for guidance.

The majority of our sister circuits that have considered the application of Calder to business torts have adopted a narrow construction. One such case is Far West Capital, Inc. v. Towne, 46 F.3d 1071 (10th Cir. 1995), which assessed the following facts to determine the existence vel non of personal jurisdiction in Utah. Towne, a Nevada resident who owned real property in Nevada, negotiated with plaintiff Far West Capital ("FWC"), a Utah corporation, which was interested in developing Towne's land. Although the negotiations occurred in Nevada, Towne sent a number of letters and faxes to the plaintiff in Utah, and there was an escrow account set up in Utah. Furthermore, during the negotiations Towne hired a consultant, a Utah resident, who occasionally picked up materials from FWC in Utah. The parties ultimately entered into a lease, which included a provision that the agreement would be governed by Nevada law. FWC subsequently negotiated with a third party in California regarding financing for the construction of a power plant on the property. Towne interfered, and FWC brought suit in Utah for, inter alia, intentional interference with contractual relations. See id. at 1073-74.

Towne claimed that she was not subject to personal jurisdiction in Utah for lack of minimum contacts. FWC rejoined that personal jurisdiction was proper under Calder because Towne had intentionally committed torts against it in Utah. The Tenth Circuit held that jurisdiction would not lie under Calder. See id. at 1080. The court noted initially that Calder did not set forth a per se rule that the allegation of an intentional business tort alone is sufficient to confer personal jurisdiction in the forum where the plaintiff resides. See id. at 1078. Instead, the court held

13

that it must still examine the "prior negotiations and contemplated future consequences along with the terms of the contract and the parties' actual course of dealing" and "the contacts created by the out-of-state defendant in committing the alleged tort." Id. at 1079-80. The court concluded that, on the facts of this case:

> [T]here is no indication that Utah had anything but a fortuitous role in the parties past dealing or would have any role in their continuing relationship. . . . There is thus no evidence that defendants' alleged torts had any connection to Utah beyond plaintiff 's corporate domicile. Although FWC argues that it suffered the financial effects of these alleged torts in Utah where it is incorporated, we hold that under Calder and its progeny, the defendants' contacts with Utah are insufficient to establish personal jurisdiction in this case.

Id. at 1080.

On facts strikingly similar to our own, the Fifth Circuit reached a similar conclusion in Southmark Corp. v. Life Investors Inc., 851 F.2d 763 (5th Cir. 1988). There, the question was whether personal jurisdiction would lie properly in Texas. Defendant Life Investors Inc. ("Life") owned 22% of the outstanding shares of International Bank ("IB") stock. Southmark, a Georgia corporation with its principal place of business in Texas, began negotiating with Life to purchase its shares of IB, with Southmark contending that the parties had ultimately formed a contract. Life, however, sold its shares to USLICO. Southmark brought suit in Texas against Life and joined USLICO as a defendant, claiming tortious interference with the alleged contract and business relations. USLICO, a Virginia corporation, moved to dismiss for lack of personal jurisdiction. Relying principally on Calder, Southmark contended that the exercise of specific jurisdiction was proper because USLICO had committed an intentional tort against it in Texas with knowledge that it was a Texas resident. See id. at 772.

The court rejected this argument, holding that "there is no evidence that USLICO expressly aimed its allegedly

14

tortious activities at Texas, nor is there evidence that USLICO knew the brunt of Southmark's injury would be felt there." Id. Moreover, the court found that "nothing in the record indicates that USLICO expressly aimed its allegedly tortious activities at Texas, or that Texas is even the focal point of USLICO's tortious conduct." Id. at 773. The court also underscored the fact that the oral agreement with which USLICO allegedly interfered was negotiated outside of the forum state, and there was no evidence that the agreement was made or to be performed in the forum or governed by its laws. See id. at 772-73.

The court concluded that the fact that the plaintiff had its principal place of business in the forum was a "mere fortuity," and declined to exercise jurisdiction. See id. at 773. Importantly, the court reasoned:

> While it may be true that USLICO agreed to buy the stock knowing that Southmark has its principal place of business in Texas, and that Southmark is therefore a Texas resident for jurisdictional purposes, we do not think this fact standing alone would cause USLICO to anticipate being haled into a Texas court to answer for its conduct.

Id. In other words, the Fifth Circuit was unconvinced of two critical facts. First, the court was not persuaded that Southmark would feel the brunt of the injury caused by USLICO in Texas simply because its principal place of business was located there. See id. Second, the court was not persuaded that USLICO's intent to interfere with the contractual relations of a company residing in Texas necessarily meant that USLICO had "expressly aimed" its tortious conduct at Texas. Id. at 772.

This concern over whether a court can automatically infer that a defendant expressly aimed its tortious conduct at the forum from the fact that that defendant knew that the plaintiff resided in the forum was also addressed in Esab Group, Inc. v. Centricut, Inc., 126 F.3d 617 (4th Cir. 1997), cert. denied ___U.S. ___, 118 S. Ct. 1364 (1998). Plaintiff, a Delaware corporation residing in South Carolina, brought suit in South Carolina alleging that the defendant, a New Hampshire company, participated in a conspiracy to

15

appropriate plaintiff 's trade secrets and customer lists. All the alleged co-conspirators were either Florida or New Hampshire residents. The only South Carolina "contact" in the case was the defendant's knowledge that his acquisition of the trade secrets could result in lowered sales for the plaintiff. Id. at 625. The Fourth Circuit concluded that this knowledge alone did not "manifest behavior intentionally targeted at and focused on South Carolina" under Calder. Id. The court further reasoned that while it is true that a corporation "feels" lost sales at its headquarters, permitting Calder to be satisfied on this basis would mean that jurisdiction in intentional tort cases would always be appropriate in the plaintiff 's home state, since the plaintiff always "feels" the impact of the tort there. Id. at 625-26.

In sum, Far West, Southmark and Esab Group all stand for the proposition that the mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy Calder. In all of those cases, the plaintiffs failed to point to other actions that adequately demonstrated that the defendants targeted (or "expressly aimed" their conduct at) the forum, and thereby showed that the forum was the focal point of the tortious activity. See also General Electric Capital Corp. v. Grossman, 991 F.2d 1376, 1387-88 (8th Cir. 1993) (concluding that Calder is of little help to a plaintiff where the "focal point of the alleged wrongdoing" occurred outside of the forum even where the "effects of the harm" occurred in that state); Noonan v. Winston Co., 135 F.3d 85, 90-91 (1st Cir. 1988) (holding that Calder test was not satisfied because defendants did not target forum even though plaintiffs felt tortious effect there). Moreover, Calder requires that the "brunt" of the harm be felt in the forum. See Calder, 465 U.S. at 789. These cases cast doubt on the assertion that a company will feel the "brunt" of a tort injury at its principal place of business when that injury is based on damage to contracts or property not centered in the forum.

There is one counterpoint, however, for the Seventh Circuit recently endorsed a broader reading of Calder. In Janmark, Inc. v. Ready, 132 F.3d 1200 (7th Cir. 1997), both plaintiff and defendant sold mini shopping carts

16

nationwide; Janmark did so from its base in Illinois, and Ready (through his company Dreamkeeper) from California. Ready believed that he had a copyright in the Dreamkeeper cart design, and tried to use his copyright claim to "orchestrate an agreement" among all mini shopping-cart sellers. See 132 F.3d at 1202. Janmark resisted Ready's overtures, and Ready allegedly responded by threatening Janmark's customers with suits for contributory copyright infringement. According to Janmark, one such threat induced a customer in New Jersey to cease buying from Janmark, which Janmark contended was an intentional tort in Illinois sufficient to establish personal jurisdiction there under Calder.

The Seventh Circuit found that the Illinois court could properly exercise jurisdiction over Ready. The court stated that, after Calder "there can be no serious doubt . . . that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." Janmark, 132 F.3d at 1202. The court further opined that since "a wrong does not become a `tort' until an injury has occurred," the complained-of tort of interference with prospective economic advantage was not completed until Janmark's customer in New Jersey canceled his order. Id. Accordingly, the court concluded, the injury (and hence the tort) occurred in Illinois, and thus jurisdiction was properly laid there. Id.

Finding the cases previously cited to be better reasoned, we decline to follow Janmark. We believe that the Seventh Circuit interpreted Calder too broadly when it read that case to hold that "the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." Janmark, 132 F.2d at 1202. Even assuming that the Seventh Circuit was only referring to intentional torts (since Calder clearly was clearly not concerned with negligence), such a broad sweep fails to accommodate Calder's emphasis on the fact that the forum must be the focal point of the harm and that the defendant must expressly aim the tortious activity at the forum. Janmark relies solely on the geographical locus of the harm caused; in doing so, it fails to pay necessary attention to the

17

defendant's knowledge and intent in committing the tortious activity.[5]

A hypothetical, posed to counsel at oral argument, may clarify this point. Suppose X, a closely-held corporation incorporated and located in New Jersey, purchases W, a French widget manufacturing company. Further suppose that Y, another French corporation that also manufactures and distributes widgets, interferes with W's prospective business advantage by tortiously acquiring W's largest customer, causing the value of W's stock to plummet. Finally, assume that Y was unaware that X had become the owner of W at the time the tortious acts were committed. We believe that, under Calder, X would not be able to sue Y for its intentional torts in the New Jersey district court. Even if we assume that the Calder test is otherwise satisfied, it would be impossible to conclude that Y expressly aimed its tortious activity at New Jersey since Y simply did not know that a New Jersey corporation could be the victim of its conduct. Under a literal reading of Janmark, however, personal jurisdiction would appear to be appropriate in New Jersey if we concluded (as the Janmark court presumably would) that the injury occurred there.[6]

An analogous situation to our hypothetical was presented

_____

5. As we explain infra in footnote 9, we need not (and do not) deal with the "focal point of the harm" issue here.

6. To be fair, this hypothetical is different from Janmark in at least one important respect. The hypothetical sets up a three-party scenario wherein Y knows that it is tortiously interfering with W, but is not aware of X, the absentee foreign owner. In Janmark, by contrast, there were only two players -- Janmark and Dreamkeeper -- and thus it may have been obvious to the Seventh Circuit that Janmark knew where its victim was located (and presumably where it would feel the brunt of the injury) when it committed its tortious acts. To that end, Janmark may not have discussed the tortfeasor's knowledge because it simply was not in dispute. As we discuss below, however, we believe that the presence of such knowledge, without more, is itself insufficient to satisfy Calder's "expressly aimed" requirement. Moreover, our speculation about what facts may have been obvious to the panel that decided Janmark does not change the fact that that case does not apply the"expressly aimed" requirement and, to the contrary, contains the overly broad language discussed supra.

18

to the Ninth Circuit in Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414 (9th Cir. 1997). In that case, the plaintiff, an Arizona corporation, provided Internet marketing services through its web site under the registered service mark "Cybersell." The defendant, a Florida corporation, provided business consulting services through its web site under the same name. At the time the defendant chose the name "Cybersell" for its venture, the plaintiff 's web site was not operational, and the Patent and Trademark Office had not granted plaintiff 's application for the service mark. See 130 F.3d at 415. Plaintiff instituted suit in the District of Arizona, alleging, inter alia, trademark infringement, and defendant moved to dismiss for lack of personal jurisdiction. The Ninth Circuit rejected the argument that jurisdiction was proper under Calder, reasoning that the defendant's web site was "not aimed intentionally at Arizona knowing that harm was likely to be caused there." Id. at 420. As with our hypothetical, even if we assume that the plaintiff suffered its injury in Arizona (which the Ninth Circuit did not, see id.), Calder would not support jurisdiction here since the defendants could not have expressly aimed their conduct at the forum.7

We recognize that a conservative reading of Calder may significantly limit the types of business tort cases that will

_____

7. In contrast is the Ninth Circuit's decision in Panavision Int'l, L.P. v.
Toeppen, 141 F.3d 1316 (9th Cir. 1998), another cyberspace case. There, the plaintiff (who manufactured motion picture camera equipment and whose principal place of business was in California) brought suit against an Illinois defendant in California for dilution of its trademark. The defendant allegedly had established a web site using Panavision's trademark as its domain name, preventing Panavision from registering its own web site on the Internet with the domain name "Panavision.com," in order to force Panavision to pay the defendant a fee to use the name on the Internet. See id. at 1321. The defendant moved to dismiss on personal jurisdiction grounds. The Ninth Circuit disagreed, holding the jurisdiction was proper under Calder since the defendant knew that plaintiff would suffer harm in California because, as in Calder, the heart of the motion picture industry is located there. See id. at 1321-22. In our
view, the dispositive facts of Panavision closely track those of Calder (i.e.,
the unique relationship between the motion picture industry and the forum), and therefore this case does not undermine the analysis in Cybersell.

19

satisfy the requirements of personal jurisdiction via the "effects test." Yet, we believe that such a result is consistent with the Supreme Court's intended relationship between Calder and the traditional minimum contacts analysis. Calder did not change the fact that even in intentional tort cases the jurisdictional inquiry "focuses on the relations among the defendant, the forum, and the litigation." See Keeton, 465 U.S. at 780. Nor did Calder carve out a special intentional torts exception to the traditional specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state. What Calder did was recognize that, under certain circumstances, the "plaintiff 's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum. Plaintiff 's residence may be the focus of the activities of the defendant out of which the suit arises." Keeton, 465 U.S. at 780 (citing Calder, 465 U.S. at 788-89). That is, the unique relations among the defendant, the forum, the intentional tort, and the plaintiff may under certain circumstances render the defendant's contacts with the forum -- which otherwise would not satisfy the requirements of due process -- sufficient.

Accordingly, we reject Janmark and agree with the conclusion reached by the First, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that jurisdiction under Calder requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum. Moreover, we agree with the Far West, Southmark, and Esab Group decisions that the Calder "effects test" can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity. Simply asserting that the defendant knew that the plaintiff 's principal place of business was located in the forum would be insufficient in itself to meet this requirement.[8] The defendant must

---

8. Thus, to return to the hypothetical raised above, the fact that Y (our tortfeasing widget concern) knew that W (its competitor) was owned by X (the New Jersey company) and that X would experience the injury caused by the drop in W's value at its headquarters in New Jersey would not by itself be enough to meet X's burden to show that Y "expressly aimed" its conduct at New Jersey.

20

"manifest behavior intentionally targeted at and focused on"
the forum for Calder to be satisfied. Esab Group, 126 F.3d
at 625; see also Southmark, 852 F.2d at 773. In the typical
case, this will require some type of "entry" into the forum
state by the defendant. As even the Seventh Circuit has
noted:

> In Calder as in all the other cases that have come to
> our attention in which jurisdiction over a suit involving
> intellectual property (when broadly defined to include
> reputation, so that it includes Calder itself) was
> upheld, the defendant had done more than brought
> about an injury to an interest located in a particular
> state. The defendant had also "entered" the state in
> some fashion, as by the sale (in Calder) of the
> magazine containing the defamatory material.

Indianapolis Colts, Inc. v. Metropolitan Baltimore Football
Club, 34 F.3d 410, 412 (7th Cir. 1994).

To summarize, we believe that the Calder"effects test"
requires the plaintiff to show the following:

> 1) The defendant committed an intentional tort;
>
> 2) The plaintiff felt the brunt of the harm in the forum
> such that the forum can be said to be the focal
> point of the harm suffered by the plaintiff as a
> result of that tort;9

_____

9. We note that, although we need not accept or reject for purposes of
this appeal the proposition that the effects of Kiekert's conduct were
"felt" by Imo in New Jersey, the proper resolution of this issue is far
from
clear. The alleged harm in this case was felt by a corporation, not an
individual, and at least one court has concluded that a corporation "does
not suffer harm in a particular geographic location in the same sense
that an individual does." Core-Vent Corp. v. Nobel Indus., 11 F.3d 1482,
1486 (9th Cir. 1993). Moreover, a distinction could arguably be made
between torts against a corporation resulting in specific property damage
(e.g., if Kiekert had physically destroyed Imo property) and those torts
resulting in more inchoate injuries (e.g., a decrease in stock value),
like
those alleged here. At the same time, this court has previously stated in
a personal jurisdiction case, albeit in dicta, that"[i]t is questionable
judicial policy to apply a different jurisdictional rule to individuals
than
to corporations, to small enterprises than to large ones. To indulge in

21

> 3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity;

As the above discussion suggests, in order to make out the third prong of this test, the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum.

C. Application

In view of the foregoing analysis, the critical question in this case is whether Imo has pointed to acts undertaken by Kiekert which demonstrate that it "expressly aimed" its tortious conduct at New Jersey, distinguishing it from the defendants in Far West, Southmark, and Esab Group. Only if this requirement is satisfied need we consider whether the brunt of the harm was actually suffered by Imo in the forum. At oral argument, counsel for Imo drew our attention to the following seven facts:

> 1) Kiekert knew that Imo was headquartered in New Jersey;
>
> 2) Kiekert knew that Imo had agreed to sell its stock in Roltra to Valeo;
>
> 3) Kiekert engaged in a series of phone calls, letters and meetings which interfered with the proposed Valeo contract;
>
> 4) Kiekert acted with the intent to scuttle the contract;

---

such ad hoc determinations creates confusion where there should be certainty. . . ." Dollar Savings Bank v. First Security Bank of Utah, 746 F.2d 208, 214 (3d Cir. 1984). That case dealt with different factual circumstances and was not concerned with whether a plaintiff "felt" the effects of a defendant's tortious conduct for Calder analysis purposes. However, because our decision is based on other grounds, we need not decide how our reasoning in Dollar would apply in the context of a Calder analysis.

22

5) There were two calls from New Jersey to Kiekert in Germany;

6) Kiekert wrote to First Boston in New York, and it was reasonably foreseeable that such correspondence would be transmitted to Imo in New Jersey, as evidenced by the fact that it was Imo (not First Boston) who actually authored the response;

7) Imo put Kiekert on notice that its conduct would subject it to litigation in the United States.

According to Imo, these facts indicate that Kiekert acted in a manner that specifically involved New Jersey, and therefore Calder's targeting requirement is satisfied.

Essentially, this list boils down to two congeries of facts: (1) what Kiekert knew or intended when it undertook its allegedly tortious conduct; and (2) what steps Kiekert actually took during the relevant time period. It appears from the facts as alleged by Imo that Kiekert (unlike the defendant in our hypothetical or the defendant in Cybersell) knew that Imo was the parent company of Roltra, and that Imo was located in New Jersey. And for purposes of the present appeal, we must assume that Kiekert knew of the proposed sale to Valeo and acted with the intent to undermine that contract. While knowledge that the plaintiff is located in the forum is necessary to the application of Calder, as discussed above it alone is insufficient to satisfy the targeting prong of the effects test. For the same reasons, the fact that Imo advised Kiekert that it would pursue litigation in the United States sheds no light on whether Kiekert aimed its conduct at New Jersey.

Thus, we are left to determine whether the series of letters, phone calls, and meetings between June and September 1996 sufficiently demonstrate that Kiekert expressly aimed its conduct at New Jersey. As we discussed supra, the chronology includes the following events:

a) The June 17 letter from Kiekert to First Boston stating that the Kiekert licenses could not be transferred if Roltra was sold to one of Kiekert's competitors;

23

b) The July 8 letter from Kiekert to Roltra stating that Kiekert would terminate the licensing agreement if Roltra's shares were sold to a competitor;

c) Imo's letter in response to Kiekert's letter to First Boston, dated July 9;

d) Imo's letter in response to Kiekert's letter to Roltra, dated August 12;

e) On two occasions during this time, Imo's general counsel telephoned Kiekert from Imo's New Jersey offices. During these conversations, Kiekert confirmed that if Imo sold the Roltra shares to a competitor, the license agreement would be terminated;

f)  The August 27 meeting in Toronto between representatives of Kiekert and Imo;

g) The September 10 meetings between Kiekert and Imo in Germany.

We first consider the face-to-face meetings between Kiekert and Imo. Since none of these meetings occurred in New Jersey (or even in the United States), they provide no help to Imo in demonstrating that Kiekert targeted the forum. We turn next to the written correspondence. There is no dispute that all of Kiekert's letters were sent either to First Boston in New York or to Roltra in Italy. Imo submits, however, that when Kiekert mailed these letters, it was reasonably foreseeable that they would wind up in New Jersey, evidenced by the fact that the responses to both letters came from Imo's New Jersey offices. Even viewed in the light most favorable to Imo, we believe that these facts are insufficient to demonstrate that Kiekert expressly aimed its conduct at New Jersey. Kiekert's two letters were sent to New York and to Italy; even if it reasonably knew that those letters would be forwarded to Imo in New Jersey, Kiekert's acts were not directed there. To the contrary, an examination of these letters reveals that Kiekert was focusing its attention on First Boston and on Roltra, not on Imo.

This position is supported by Reynolds v. Int'l Amateur Athletic Fed., 23 F.3d 1110 (6th Cir. 1994). The plaintiff in

24

that case -- Butch Reynolds, a world-class runner-- was administered a drug test which yielded a positive result. As a consequence, he was banned by the International Amateur Athletic Federation ("IAAF") from competing for two years. In addition, the IAAF issued a press release disclosing the results of the drug test. Reynolds brought suit in Ohio, alleging that the drug test was flawed and claiming defamation and tortious interference with contractual relations.

The court rejected Reynolds' claim that jurisdiction lay under Calder, holding that: "First, the press release concerned Reynolds' activities in Monaco, not Ohio. Second, the source of the controversial report was the drug sample taken in Monaco and the laboratory testing in France. Third, Reynolds is an international athlete whose professional reputation is not centered in Ohio. Fourth, the defendant itself did not publish or circulate the report in Ohio; Ohio periodicals disseminated the report. Fifth, Ohio was not the `focal point' of the press release. The fact that the IAAF could foresee that the report would be circulated and have an effect in Ohio is not, in itself, enough to create personal jurisdiction." 23 F.3d at 1120.

The fact that Imo phoned Kiekert in response to Kiekert's letters does not change the analysis. The fact is that Kiekert never placed a phone call to Imo in New Jersey; all of the calls originated with Imo. Imo contends that this fact should not be dispositive, and that these calls should still count as contacts with the forum. Assuming for the sake of argument that we could even characterize these calls as contacts, we fail to see how they demonstrate Kiekert's targeting of New Jersey as the situs of its tortious acts. Cf. Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros., Inc., 983 F.2d 551, 556 (3d Cir. 1993) (follow-up calls by defendant into the forum insufficient to satisfy minimum contacts). Moreover, cases like Southmark and Far West make clear that a few calls or letters into the forum may be of only marginal import if the dispute is focused outside the forum. In Southmark, for example:

> [T]he oral agreement with which USLICO allegedly interfered was apparently negotiated and made in Atlanta and/or New York, and there is no evidence that

25

> the agreement was made or to be performed in Texas or governed by Texas law. Life, the other party to the purported agreement, is not a resident of Texas. . .. The company whose stock Southmark wished to purchase and that USLICO did purchase was not a Texas corporation and it did not, so far as the record shows, do any business in Texas. Nor is there evidence that the stock was located or purchased in Texas.

Southmark, 851 F.2d at 772-73 (footnote omitted).

Much the same could be said here. The solicitation of bids for Roltra was done in New York, and the bid with which Kiekert allegedly interfered came from a French company. The subject of the bidding was an Italian company, and the licensing agreement upon which the allegedly tortious activity was based appears to be governed by German law. In that light, the fact that it may be reasonably foreseeable that First Boston and/or Roltra would have passed Kiekert's letters on to Imo in New Jersey (and that Imo called Kiekert from New Jersey) cannot be sufficient to overcome the clear implication from the surrounding facts that New Jersey was not the focus of the dispute. See also Far West, 46 F.3d 1071, 1077 (finding that "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts" when the focus of the dispute is outside the forum).

In sum, Imo cannot demonstrate that Kiekert expressly aimed its tortious conduct at New Jersey. Failing this, Imo cannot rely on the Calder effects test to confer specific jurisdiction based on Kiekert's allegedly intentional tortious conduct. Since Imo cannot meet the minimum contacts requirement of the Due Process Clause, we will affirm the order of the district court dismissing this case for lack of personal jurisdiction.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

26