# United States Court of Appeals
## For the First Circuit

No. 00-2502

UNITED STATES OF AMERICA,

Plaintiff, Appellant,

v.

SWISS AMERICAN BANK, LTD.,
SWISS AMERICAN NATIONAL BANK, and
INTER-MARITIME BANK, GENEVA,

Defendants, Appellees.

───────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

───────────

Before

Torruella and Lipez, Circuit Judges,

and Tauro,[*] District Judge.

───────────

Mia Levine, Trial Attorney, United States Department of Justice, with whom Gerald E. McDowell, Chief Trial Attorney, Karen Taylor, Trial Attorney, Donald K. Stern, United States Attorney, and Richard L. Hoffman, Assistant United States Attorney, were on brief, for appellant.

Howard Wilson, with whom Alan H. Scheiner, Rosenman & Colin LLP, Michael B. Keating, Sarah Cooleybeck, and Foley, Hoag & Eliot LLP were on brief, for appellees Swiss American Bank, Ltd. and Swiss American National Bank.

Wm. Shaw McDermott, with whom Irene C. Freidel, Aimee Bierman, and Kirkpatrick & Lockhart LLP were on brief, for appellee Inter-Maritime Bank, Geneva.

───────────

[*] Of the District of Massachusetts, sitting by designation.

December 27, 2001

**TORRUELLA, <u>Circuit Judge</u>.**  The United States government attempted to recover $7 million in drug proceeds that a Massachusetts resident deposited in an Antiguan bank and then forfeited to the United States as part of a plea agreement.  After the bank did not turn over the funds, the United States filed a claim in the Massachusetts District Court for conversion, unjust enrichment, and breach of contract against Swiss American Bank and its alleged alter ego, Bank of New York-Inter-Maritime Bank.  For the second time, the government appeals the court's dismissal of the case for lack of personal jurisdiction and its refusal to allow jurisdictional discovery.  After completing a plenary review, we agree with the district court that the government failed to make a prima facie showing of specific or general jurisdiction, and conclude that the district court acted within its discretion to deny the government jurisdictional discovery.  We therefore affirm the judgment.

**I.**

Between 1985 and 1987, John E. Fitzgerald, a resident of Massachusetts, deposited about $7 million in Swiss American Bank and Swiss American National Bank (collectively SAB), both organized under the laws of Antigua and Barbuda and located there.  Fitzgerald deposited the money in accounts held in the name of shell corporations.[1]

_____

[1] According to the government, the accounts were held in the name of Rosebud Investments, Ltd., White Rose Investments, Ltd., Handle Investments, Ltd., J & B Investments, Ltd., and Guardian Bank, Ltd.

When he made the deposits, SAB was the wholly owned subsidiary of Swiss American Holding Company,[2] a Panamanian corporation, which in turn was wholly owned by Bank of New York-Inter-Maritime Bank (IMB), an institution organized under Swiss law and based in Geneva.

In 1993, Fitzgerald pled guilty to several counts of conspiracy for racketeering and attempted money laundering. He admitted that the funds deposited at SAB were drug proceeds that he had laundered through shell corporations organized with the help of Peter F. Herrington, then SAB's general manager. During some of the time that Fitzgerald deposited his money at SAB, his funds represented about one-third of the bank's total deposits. As part of his plea agreement, Fitzgerald agreed to forfeit the money in his SAB accounts to the United States government.

In November 1993, the U.S. District Court for the District of Massachusetts entered a preliminary order of forfeiture regarding the deposited funds. Beginning in January 1994, the United States made a series of requests to the Antiguan government seeking assistance in recovering the money. Meanwhile, notice of the impending forfeiture was published in the Antiguan Gazette and the Boston Globe. No competing

_____

For clarity's sake, we refer to them collectively as "Fitzgerald's accounts."

[2] The government failed to serve Swiss American Holding Company. As a result, it is not a party to this litigation.

-4-

claims were filed.  However, on March 28, 1994, during the filing period, SAB sent a letter to the district court that stated:

> [I]n the event of your action for forfeiture being successful, the banks have been instructed by the Government of Antigua and Barbuda to freeze all of the assets . . . in issue in your Petition, until the ultimate beneficial owners have been ascertained to the Government's satisfaction.  This is a directive that the banks have to honor on pain of having their licences revoked and is a problem that you may well have to address on the successful conclusion of your litigation.

On May 4, 1994, the district court entered a final order decreeing the money in Fitzgerald's SAB account to be forfeited to the United States.  In a November 13, 1995 letter, the Solicitor General of Antigua informed the United States that the bank records of Fitzgerald's account had been destroyed in a September 1995 hurricane and that the funds had been frozen by the Antiguan government.  On November 20, 1995, the United States learned from a lawyer for Antigua that the SAB funds were "no longer available" because they had been transferred to the Antiguan government and used to pay off debts.  It is undisputed that in either December 1994 or January 1995, after the final order of forfeiture was entered, SAB transferred $5 million from Fitzgerald's account to the Antiguan government and kept the remaining $2 million, apparently to pay off loans taken out by Fitzgerald.  SAB and the Antiguan government agree that the funds were disbursed with the Antiguan government's approval.

On December 23, 1997, the United States filed a complaint in federal district court in Massachusetts suing SAB and IMB for conversion, unjust enrichment, and breach of contract. On September 30, 1998, the district court dismissed the government's case for lack of personal jurisdiction. See United States v. Swiss Am. Bank, Ltd., 23 F. Supp. 2d 130 (D. Mass. 1998) (Swiss I). The court ruled that the government failed to show that the defendants were beyond the jurisdictional reach of any state court of general jurisdiction, as required by Federal Rule of Civil Procedure 4(k)(2). Id. at 136. The court also denied the government's request for discovery because of its failure to plead this element of personal jurisdiction. Id.

The government appealed, and we reversed the district court's dismissal for lack of jurisdiction under Rule 4(k)(2). See United States v. Swiss Am. Bank, Ltd., 191 F.3d 30 (1st Cir. 1999) (Swiss II). We said that three elements are required for the exercise of personal jurisdiction under Rule 4(k)(2): (1) the plaintiff's claim must arise under federal law; (2) the defendant must be beyond the jurisdictional reach of any state court of general jurisdiction (the "negation requirement"); and (3) the exercise of jurisdiction must not violate the defendant's rights under the Constitution or federal law. See id. at 38-39. We found that the government had satisfied the first element of this test, and directed the district court to apply a new burden-shifting framework to the negation requirement. See id. at 41. We

-6-

also directed the court to reconsider the government's request for discovery in light of the new negation requirement analysis that we set forth. See id. at 46. Finally, we declined to rule on IMB's argument that the case against it should be dismissed on the merits, saying that this matter should await resolution of the jurisdictional issue. See id. at 46-47.

On remand, SAB and IMB renewed their motions to dismiss, and the government subsequently renewed its request for discovery. The district court held a hearing on these motions on March 30, 2000. The court's review included affidavits and related evidence submitted by both parties, including a report from the government's investigator, as well as the allegations contained in the pleadings. At the hearing, the court granted IMB's motion to dismiss for failure to adequately plead alter ego liability and for lack of personal jurisdiction. See United States v. Swiss Am. Bank, Ltd., 116 F. Supp. 2d 217, (D. Mass. 2000)(Swiss III). Following the hearing, the court issued a written opinion dismissing the case against SAB for lack of personal jurisdiction. See id. at 225. Applying the burden-shifting framework set forth in Swiss II, the court found that the defendants had conceded the negation requirement. Id. at 220. It then turned to the third element under Rule 4(k)(2): whether jurisdiction would violate constitutional due process because the defendants lacked adequate contacts with the United States as a whole and because the exercise of

jurisdiction would be unreasonable.  <u>Id.</u>  The court found that the government failed to show sufficient contacts under either a general or specific theory of personal jurisdiction.  <u>Id.</u> at 222-25.  Finding that the government's jurisdictional showing was "bootless" and did not amount to a colorable claim, the court also denied the request for jurisdictional discovery.  <u>Id.</u> at 225.

It is basic law that a court must have personal jurisdiction over the parties to hear a case, "that is, the power to require the parties to obey its decrees." Swiss II, 191 F.3d at 35. At the same time, "[d]etermining personal jurisdiction has always been more an art than a science." Donatelli v. Nat'l Hockey League, 893 F.2d 459, 468 n.7 (1st Cir. 1990). As Justice Marshall said, the jurisdictional determination "is one in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable." Id. (quoting Kulko v. Super. Ct., 436 U.S. 84, 92 (1978)) (internal quotation marks and citations omitted).

The personal jurisdiction inquiry in federal question cases like this one differs from the inquiry in diversity cases. See 28 U.S.C. § 1332. Here, "the constitutional limits of the court's personal jurisdiction are fixed . . . not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1992) (Pleasant St. I). This distinction matters because under the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state. See id. At the same time, however, the plaintiff must still ground its service of process in a federal statute or civil rule. See id. In this case, the government's

asserted basis for jurisdiction is Federal Rule of Civil Procedure 4(k)(2).[3] The Rule functions "as a species of federal long-arm statute" by "clos[ing] [the] loophole" that existed when foreign defendants "lacked single-state contacts sufficient to bring them within the reach of a given state's long-arm statute," but "had enough contacts with the United States as a whole to make personal jurisdiction over them in a United States court constitutional." Swiss II, 191 F.3d at 40. Whereas state long-arm statutes require a showing that the parties have sufficient contacts with the forum state, Rule 4(k)(2) requires a showing that the parties have sufficient contacts with the United States as a whole.

"A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction." Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998). "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities."

---

[3]  Enacted in 1993, the Rule provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2).

-10-

Id. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." Pleasant St. I, 960 F.2d at 1088. Here the government argues that it has met the tests for both general and specific jurisdiction. In the alternative, the government contends that if its jurisdictional showing fell short, the district court should have allowed it to take limited discovery of SAB's contacts with the United States as a whole.

When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the "prima facie" standard governs its determination. See United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39, 43 (1st Cir. 1993) (Pleasant St. II); Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992). "Under this standard, it is plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." Pleasant St. II, 987 F.2d at 44 (internal quotation marks omitted). "The prima facie showing must be based upon evidence of specific facts set forth in the record." Id. To meet this requirement, the plaintiff must "go beyond the pleadings and make affirmative proof." Id. (internal quotation marks omitted). However, in evaluating whether the prima facie standard has been

satisfied, "the district court is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law." Id. When "the district court employs the prima facie standard . . . appellate review is de novo." Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 147 (1st Cir. 1995).

## A. General Jurisdiction

The government argues that it has demonstrated sufficient contacts to make a prima facie showing of general jurisdiction. In evaluating whether the exercise of personal jurisdiction is warranted, courts concentrate on the "quality and quantity of contacts between the potential defendant and the forum." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999). The assertion of general jurisdiction comports with due process when two criteria are met. First, there must be "continuous and systematic general business contacts" between the foreign defendant and the forum. Helicópteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984). Second, the plaintiff must show that the exercise of jurisdiction would be reasonable. See Donatelli, 893 F.2d at 465 (discussing the five "gestalt factors" used to determine fundamental fairness of exercising jurisdiction). As a threshold matter, "[t]he standard for evaluating whether these contacts satisfy the constitutional general jurisdiction test is considerably more stringent than that applied to specific

-12-

jurisdiction questions." <u>Noonan</u> v. <u>Winston Co.</u>, 135 F.3d 85, 93 (1st Cir. 1998) (internal quotation marks omitted).

We start with the defendant's contacts with the forum because "[i]f the same do not exist in sufficient abundance . . . the inquiry ends." <u>Donatelli</u>, 893 F.2d at 465.  The district court found that the contacts discovered by the government's investigator, and taken as true for purposes of the motion to dismiss, were as follows: (1) in 1992 and 1993 SAB placed twelve advertisements in American Way magazine, a publication of American Airlines; (2) during an unspecified period, SAB subscribed to Visa International, a California credit card company, and entered into a licensing agreement with MasterCard International, a New York company; (3) in 1990, SAB was an appellant in a lawsuit in a Florida court; (4) in 1998, information about SAB was posted on three internet sites;[4] (5) in 1996, SAB entered into a contract with Arkansas Systems, Inc., an Arkansas company, for the provision of ATM support services; (6) sometime before 1985, SAB entered into a joint venture with Home State Savings Bank of Ohio; (7) in 1996, SAB loaned $350,000 to a Colorado company that runs an internet service called Sportspiks; (8) in 1996, SAB "may have" had business relations with Nhancement Technologies, Inc., a California company;  (9) SAB "had correspondent

---

[4] Because we consider only contacts established before the government filed its complaint in December 1997, <u>see</u> <u>Noonan</u>, 135 F.3d at 93 n.8, the appearance of information about SAB on the internet in 1998 is not relevant to our analysis.

banking relationships and accounts" with four New York banks; and (10) SAB had a business relationship with Fitzgerald. See Swiss III, 116 F. Supp. 2d at 221-22.

The government concedes that SAB has no office, personnel, or telephone number in the United States, but nevertheless argues that the contacts described above are continuous and systematic when considered "in the aggregate." Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994). The government contends that the contacts show that "SAB conducts business in the United States without the need for a physical presence," and that "[a]s the banking universe expands to include Internet banking and correspondent bank relationships as routine, so too must the bases under which internationally active banks are held accountable by the jurisdictions in which they have customers and conduct business."

Compelling as this argument may be in some respects, it fails the legal test for "continuous and systematic" contacts. In determining what constitutes "continuous and systematic" contacts, our analysis is "a fact-specific evaluation" of the defendant's contacts with the forum. Noonan, 135 F.3d at 93. For guidance in this factual inquiry, we look to "the types of contacts deemed sufficiently continuous and systematic in other cases." Id.

As the district court correctly pointed out, SAB's contacts with the United States are less continuous and systematic than contacts

-14-

found to be insufficient for general jurisdiction in previous cases. See Swiss III, 116 F. Supp. 2d at 224-25.  In Helicópteros, the Supreme Court found that a Texas district court could not exercise jurisdiction over a Colombian corporation that sent its chief executive officer to Houston for contract negotiations; accepted into its New York bank accounts checks drawn on a Houston bank; bought equipment and training services from a Texas corporation; and sent personnel to that corporation's Texas facilities for training.  466 U.S. at 416.

Similarly, in Noonan, we found that the Massachusetts district court could not exercise jurisdiction over a British company that sent an employee to Massachusetts to photograph the plaintiff, directly solicited business from a Massachusetts company, and received $585,000 in orders from that same company.  135 F.3d at 93.  In Donatelli, we said that no jurisdiction attached in Rhode Island over the National Hockey League, which for ten years provided league officials at exhibition games, telecast games into Rhode Island, and sold products with the National Hockey League logo.  893 F.2d at 470-71.  In Glater, the defendant Indiana corporation employed eight sales representatives in New Hampshire, conducted business in the state, and advertised in trade journals that circulated there.  744 F.2d at 215.  We said that "these vestigial contacts" did not suffice for the exercise of jurisdiction.  Id. at 217.

In short, the government has not shown that SAB's limited and intermittent contacts with the United States rise to the level of what we have previously understood as "continuous and systematic." As a result, the government has not made the prima facie showing needed for the exercise of general personal jurisdiction.

## B.  <u>Specific Jurisdiction</u>

The government asserts that even if it has not shown contacts sufficient to satisfy the "continuous and systematic" threshold for general jurisdiction, it has nevertheless proved individual contacts with the forum sufficient for the exercise of specific jurisdiction. Determining whether the plaintiff has alleged sufficient facts for a finding of specific jurisdiction requires a three-part analysis. <u>Phillips Exeter</u>, 196 F.3d at 288.

> First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum.  Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws.  Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.

<u>Id.</u> We begin with the question of whether the government made a prima facie showing that its claims were directly related to or arose out of SAB's contacts with the United States.

"The requirement that a suit arise out of, or be related to, the defendant's in-forum activities comprises the least developed prong of the due process inquiry." Ticketmaster-N.Y., 26 F.3d at 206. "We know to a certainty only that the requirement focuses on the nexus between defendant's contacts and the plaintiff's cause of action." Id.; accord Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995). We begin by identifying the alleged contacts, since there can be no requisite nexus between the contacts and the cause of action if no contacts exist. Cf. Sawtelle, 70 F.3d at 1389 (stating that the defendant's contacts are central to each prong of the tripartite analysis).

In this case, the government essentially alleges two relatedness contacts between SAB and the United States. First, the government asserts that the contractual relationship between SAB and Fitzgerald (or the United States, as Fitzgerald's successor in interest) constitutes a contact, one which was overlooked by the district court. Second, the government claims that the injurious effects of the alleged conversion were felt in the United States, and thus constitute a contact with the forum. The government does not allege any other related contacts with the forum, such as telephone calls, mail, or physical presence.

We turn first to the alleged contact based on the relationship between Fitzgerald and SAB. The flaw in the government's

-17-

argument is that SAB's business relationship and/or contract with Fitzgerald, however, is not itself a contact with the United States as a forum. See Sawtelle, 70 F.3d at 1389 (stating that the relatedness requirement is not met by a cause of action that arises out of a general relationship between the parties, but rather, that the action must arise out of specific contacts between the defendant and the forum). A contract is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985) (internal quotations omitted). A contract, by itself, cannot automatically establish minimum contacts. Id. at 478. Rather, Burger King developed what we have described as a "'contract-plus' analysis." Ganis Corp. v. Jackson, 822 F.2d 194, 197-98 (1st Cir. 1987). Thus, "prior negotiations and contemplated future consequences, along with . . . the parties' actual course of dealing . . . must be evaluated in determining whether the defendant" has minimum contacts with the forum. Burger King, 471 U.S. at 479 (finding that franchise contract, which envisioned a twenty-year relationship and continuing contacts with the forum, constituted a contact for purposes of due process analysis).

The government concedes that there is no evidence that Herrington or any other SAB representative went to the United States in connection with Fitzgerald's accounts. SAB's lack of a physical

-18-

presence in the United States, however, is not fatal to the case for jurisdiction. See Burger King, 471 U.S. at 476 ("Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State."); Pritzker v. Yari, 42 F.3d 53, 62 (1st Cir. 1994) ("a non-resident defendant may not always be able to elude the net by such simple expedients as remaining physically outside the forum"). When physical presence is lacking, we look for some other indication that the defendant reached into the forum, such as mail or telephone contacts. See Burger King, 471 U.S. at 476; Mass. Sch. of Law, 142 F.3d at 36. The government has no such evidence here. For example, the record does not show that the bank called or wrote to Fitzgerald to solicit him as a customer or to manage his account.[5] Cf. Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 716-17 (1st Cir. 1996) (defendant's correspondence soliciting business from plaintiff satisfied minimal contacts requirement). Instead, the evidence shows that Fitzgerald opened the SAB accounts in Antigua and that most of the $7 million came not directly from the United States, but from "other foreign locations." Swiss II, 191 F.2d at 38.

Although the government does not specifically argue the point, SAB's March 28, 1994 letter to the Massachusetts district court

_____

[5] There is record evidence (in a report from the government's investigator) that Herrington made phone calls to Boston in 1986 during the period in which Fitzgerald was setting up his SAB accounts. However, the report does not specify that Fitzgerald was the recipient of those calls.

-19-

informing it that the Antiguan government had frozen Fitzgerald's accounts is also a jurisdictional contact. See Sawtelle, 70 F.3d at 1389-90 (letter and call made to forum by defendant in malpractice case were "unquestionably a contact for purposes of our analysis"). The letter was not a related contact for purposes of the government's claim, however, because the letter was not essential to either the formation or breach of the alleged contract between SAB and the government. See Phillips Exeter, 196 F.3d at 289 (stating that a contact is related for purposes of a contract claim when the contact is "instrumental either in the formation of the contract or in its breach"). Rather, the letter simply gave notice that payment might not occur, so, at most, it can be considered only marginally instrumental to the alleged breach.

In sum, having examined the business relationship between SAB and Fitzgerald and/or the United States, which involves no in-forum activities, we find that the government has not satisfied Burger King's "contract-plus" requirement, see 471 U.S. at 478-79, to demonstrate that this relationship is in fact a contact with the forum for the purposes of the relatedness inquiry.

We now turn to the government's argument that the effects of the injuries caused by SAB's activities qualify as related contacts. The relatedness inquiry for tort claims focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the

cause of action. Mass. Sch. of Law, 142 F.3d at 35. The government asserts that SAB's role in advising Fitzgerald on laundering $7 million in drug proceeds through an account in Antigua and the bank's subsequent disbursement of those funds caused wrongful effects -- the loss of the money to the United States government -- which were felt in the United States. Because SAB refused to tender the allegedly converted funds, and the effects of this injury were felt in the United States, the government opines that these in-forum effects are contacts that satisfy the relatedness element.

Because the government can point to no in-forum activities by SAB that relate to its claim, the government attempts to bolster its case for specific jurisdiction by relying on the in-forum "effects" theory inaugurated in Calder v. Jones, 465 U.S. 783 (1984). In that case, two newspapermen from Florida who were working for the National Enquirer wrote an allegedly libelous article about a California entertainer. Id. at 784-85. The article was primarily based on phone calls to California sources. Id. at 785. However, Calder did not turn on the presence of physical, mail, or telephone contacts between the defendants and the forum. Id. at 787 n.6. Instead, the Supreme Court held that California could assert personal jurisdiction over the newspapermen "based on the 'effects' of [defendants'] Florida conduct in California." Id. at 789.

Unfortunately for the government, though, in this case, Calder cannot carry the day. Calder "cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction." Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1087 (9th Cir. 2000). Calder is inapposite to this case for a number of reasons.

First, we have previously recognized that Calder's "effects" test was adopted "for determining purposeful availment in the context of defamation cases." Noonan, 135 F.3d at 90 (emphasis added). Thus, the "effects" test is a gauge for purposeful availment and is to be applied only after the relatedness prong has already been satisfied. Although "there is a natural blurring of the relatedness and purposeful availment inquiries in cases (like this one) in which the alleged contacts are less tangible than physical presence[,] . . . the inquiries are different. . . ." Phillips Exeter, 196 F.3d at 289. The purposes behind each prong bring this difference into focus.

The relatedness inquiry separates general jurisdiction from specific jurisdiction cases. Ticketmaster-N.Y., 26 F.3d at 206. When alleged contacts fall short of being "continuous and systematic" so that the exercise of general jurisdiction would be unfair, those contacts may still support the exercise of specific jurisdiction if they are related to the cause of action. Phillips Exeter, 196 F.3d at 288. The relatedness prong ensures fundamental fairness by protecting

-22-

a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue.  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980) (noting that due process protects a defendant from inconvenient forums and prevents states from overreaching the boundaries of their sovereignty); Phillips Exeter, 196 F.3d at 287-88 (stating that due process protects those whose extra-forum activities do not make personal jurisdiction in the forum foreseeable).  When the nexus between the forum contacts and the cause of action is too attenuated, it violates fundamental fairness to force a defendant with non-continuous or non-systematic contacts to defend himself in that forum.  Mass. Sch. of Law, 142 F.3d at 36 (arguing that a letter from A to B, reporting on C's actions, cannot confer personal jurisdiction over C in B's home state because the connection between B's state and C's extra-forum activities is too attenuated).

The purposeful availment inquiry, though, focuses on the defendant's intentionality.  See Noonan, 135 F.3d at 90-91 (discussing Calder's intent requirement for purposeful availment).  This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts.  See Phillips Exeter, 196 F.3d at 292; Ticketmaster-N.Y., 26 F.3d at 207-208.

-23-

*Calder* addressed purposeful availment, rather than relatedness. See *Noonan*, 135 F.3d at 90 (discussing the intent of the defendants in *Calder* by aiming their article at the forum state). *Calder* focused on the defendants' intent to cause injury in the forum by aiming their article at a forum resident and then publishing the article there, knowing that the injury would be felt in the forum. 465 U.S. at 789-90. The only contacts between one of the *Calder* defendants[6] and the forum were that his article was published within the forum and the legal injury occurred within the forum. *Calder*, 465 U.S. at 786, 790; see also *Keeton*, 465 U.S. at 777 (noting that the legal injury of libel occurs "wherever the offending material is circulated"). Both the in-forum publication and the in-forum injury were clearly related to the plaintiff's defamation suit, so the Supreme Court did not need to address the relatedness prong before proceeding to the purposeful availment inquiry. Thus, since *Calder*'s "effects" test is relevant only to the purposeful availment prong, it cannot be used to strengthen the government's relatedness showing.

Second, courts "have struggled somewhat with *Calder*'s import." *Bancroft & Masters*, 223 F.3d at 1087.[7] As we have previously

---

[6] The second *Calder* defendant had other contacts with the forum, such as the telephone calls he made to sources located in California. *Calder*, 465 U.S. at 785-86.

[7] Without conducting an exhaustive review of the case law, we note that several circuits do not appear to agree as to how to read *Calder*. Compare *Oriental Trading Co., Inc.* v. *Firetti*, 236 F.3d 938, 943 (8th

-24-

noted, <u>Calder</u>'s "effects" test was specifically designed for use in a defamation case. <u>Noonan</u>, 135 F.3d at 90 (citing <u>Calder</u> as having "adopted an effects test for determining purposeful availment in the context of defamation cases"). Thus, whether <u>Calder</u> was ever intended to apply to numerous other torts, such as conversion or breach of contract, is unclear. <u>See</u> <u>Imo Indus., Inc.</u> v. <u>Kiekert AG</u>, 155 F.3d 254, 261 (3d Cir. 1998) (noting that courts, in applying <u>Calder</u> to non-defamation cases, have adopted "a mixture of broad and narrow interpretations"); <u>McGlinchy</u> v. <u>Shell Chemical Co.</u>, 845 F.2d 802, 817 (9th Cir. 1988) (refusing to apply "effects" test to contract claim).

Third, the facts of <u>Calder</u> diverge widely from the facts in this case. Although <u>Calder</u>'s significance is based on its "effects" theory, in that case, the actual tort or injury, not just its consequences, occurred within the forum. <u>Compare</u> <u>Keeton</u> v. <u>Hustler Magazine</u>, 465 U.S. 770, 776-77 (1984) (tort of libel is generally held to occur wherever the libelous material is circulated), <u>with</u> <u>Swiss II</u>, 191 F.3d at 37 (legal injury of conversion occurs where conversion

Cir. 2001) (emphasizing numerous faxes and telephone calls into the forum in finding jurisdiction under <u>Calder</u>), and <u>Wien Air Alaska, Inc.</u> v. <u>Brandt</u>, 195 F.3d 208, 212 (5th Cir. 1999) (same), <u>with</u> <u>Imo Ind., Inc.</u> v. <u>Kiekert AG</u>, 155 F.3d 254, 260 (3d Cir. 1998) ("Generally speaking, under <u>Calder</u> an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied."), and <u>Lake</u>, 817 F.2d at 1423 (finding jurisdiction under <u>Calder</u> where nonresident attorney obtained ex parte order from out-of-forum court knowing it would be used to cause injury in the forum).

takes place). Moreover, the in-forum publication of the article in Calder provided an important contact for jurisdictional purposes; a contact that is absent in this case, since any tortious conversion or breach of contract occurred in Antigua.

Fourth, our Calder-based precedent dictates that the government's "effects" argument is insufficient here to show relatedness. "We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative." Mass. Sch. of Law, 142 F.3d at 36; accord Sawtelle, 70 F.3d at 1390-91 (relatedness showing was "tenuous at best" when based on "effects" of defendants' malpractice, committed outside of forum, and on ancillary legal advice mailed into the forum); Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 11 (1st Cir. 1986) (finding that "effects" in the forum are not equivalent to an actual injury caused in the forum by in-forum activities).

The district court, based on the government's mere showing of in-forum effects, rather than actual contacts or injury within the forum, found the government's relatedness showing so "scant" that it did not consider the purposeful availment or reasonableness elements of the tripartite jurisdictional analysis. Swiss III, 116 F. Supp. 2d at 222. We are likewise underwhelmed by the government's relatedness showing. Thus, our jurisdictional analysis need proceed no further.

-26-

Since the government has failed to satisfy the first prong of the jurisdictional test, its argument for specific jurisdiction must fail.

## C. <u>Jurisdictional Discovery</u>

In the alternative, the government requests discovery to develop additional facts. The government asked for discovery in the initial proceedings before the district court, but the court denied the motion. In <u>Swiss II</u>, we vacated the denial and directed the district court to reevaluate the government's request because the burden-shifting framework for the negation requirement that we laid out "undermine[d] the rationale for the district court's decision." 191 F.3d at 46. We noted that under our precedents, "[a] timely and properly supported request for jurisdictional discovery merits solicitous attention." <u>Id.</u> at 45.

On remand, the district court heard argument about the government's request for jurisdictional discovery. In <u>Swiss III</u>, the court denied the government's request. Considering only the relatedness element of the test for specific jurisdiction, the court said that "the government, while asserting that it has stated a 'colorable case' in satisfaction of the minimum contacts requirement for specific personal jurisdiction, offers scant evidence in support of that conclusion." 116 F. Supp. 2d at 222. The court concluded: "Indeed, so bootless . . . is the government's showing here in light of the applicable authority, that it has made no colorable claim

sufficient to entitle it to any further discovery."  Id. at 225 (citation and internal quotation marks omitted).

We have long held that "a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." Sunview Condominium Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962, 964 (1st Cir. 1997) (emphasis added); accord Surpitski v. Hughes-Keenan Corp., 362 F.2d 254, 255-56 (1st Cir. 1966). However, "that entitlement is not absolute." Sunview, 116 F.3d at 964. A plaintiff must be diligent in preserving his or her rights.  Id. Moreover, even when the plaintiff has been diligent and has made a colorable claim for personal jurisdiction, the district court still has "broad discretion to decide whether discovery is required." Crocker v. Hilton Int'l Barb., Ltd., 976 F.2d 797, 801 (1st Cir. 1992).

The standard for reversing a district court's decision to disallow jurisdictional discovery is high.  Given the trial court's broad discretion in determining whether to grant jurisdictional discovery, "[a] ruling will be overturned only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Crocker, 976 F.2d at 801 (internal quotation marks omitted) (emphasis added); see also Noonan, 135 F.3d at 94.

-28-

In this case, the government has been unable to show that the district court's denial of discovery was "plainly wrong" and an abuse of discretion.  Even if this Court disagreed with the district court's assessment that the government's jurisdictional showing was "bootless," Swiss III, 116 F. Supp. 2d at 225, such disagreement is an insufficient basis for overturning the district court's decision.  In order to reverse the district court, we would have to find that its analysis was "plainly wrong and resulted in substantial prejudice." Crocker, 976 F.2d at 801.  We can make no such finding here.

After our analysis of the government's argument, it is unclear that the government has presented what amounts to a "colorable" claim for personal jurisdiction.  As discussed above, the government's relatedness showing was unconvincing.  And, in order to find specific personal jurisdiction, all three prongs of the tripartite test must be satisfied.  Phillips Exeter, 196 F.3d at 39.  Moreover, if the plaintiff fails to make a strong showing with respect to the first two prongs, then the exercise of personal jurisdiction is more likely to be found unreasonable under the third prong.  Id. at 39 n.1.  Thus, even if this Court were ruling afresh (rather than under a restricted standard of review) on the jurisdictional discovery issue, it is not clear that discovery would be warranted.  As a result, we can hardly state that the district court was "plainly wrong" in denying discovery for lack of a colorable claim.

We have also held that, in addition to presenting a colorable claim, a plaintiff must be diligent in preserving his rights to be entitled to jurisdictional discovery. Sunview, 116 F.3d at 964. This includes the obligation to present facts to the court which show why jurisdiction would be found if discovery were permitted. See Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001). The government, here, has been less than diligent. As SAB points out, only on appeal did the government flesh out its description of the types of contacts it hopes to discover: (1) "the origins and nature of SAB's relations and contacts with Fitzgerald;" (2) "business meetings that took place in the United States, or were conducted by telephone, with persons in the United States, relating to the subject accounts;" (3) "information that might have been sent by mail or other means" by SAB to the United States; and (4) the "origin and nature of any other business relations" between SAB and American account holders or business partners. The government should have given the district court this more detailed description of the "additional pertinent avenues of inquiry" that it hoped to pursue. Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1086 (1st Cir. 1973). Because the government did not present these specifics below, they do not enter into our analysis of whether the court abused its discretion in denying the request for discovery. Failure to allege specific contacts, relevant to establishing personal jurisdiction, in a jurisdictional discovery request can be fatal to

-30-

that request. See Crocker, 976 F.2d at 801 (denying discovery where appellants sought information, irrelevant to forum contacts, on solicitation of business and the provision of goods or services outside of the forum); Noonan, 135 F.3d at 94 (denying discovery where plaintiffs sought information about the interrelationships among the defendants; information irrelevant to purposeful availment).

Given the overall unpersuasive case for personal jurisdiction, the government's failure to allege specific contacts it was seeking to discover, and the wide discretion given to the district court, we cannot conclude, in light of our precedent, that the district court was "plainly wrong" in denying discovery.

## III.

In its complaint, the government alleged that IMB is SAB's alter ego. At the March 30, 2000 hearing on SAB's and IMB's motions to dismiss, the district court dismissed the government's case against IMB "for failure adequately to plead allegations of alter ego liability and for lack of personal jurisdiction." Swiss III, 116 F. Supp. 2d at 219. On appeal, the government challenges this ruling. In the alternative, it contends that it should have been allowed to take discovery about IMB's relationship with SAB, arguing, as it did below, that discovery is needed because "the defendants exclusively hold the critical information that would explain the events surrounding the disappearance of the funds."

-31-

In Swiss II, IMB argued that it could not be held liable for SAB's alleged misconduct because it was not SAB's alter ego. We said that this argument was "premature" because it involved "reaching the merits of a case," which, according to Supreme Court precedent, "should await a determination of the district court's jurisdiction over IMB." 191 F.3d at 46. We noted "[t]he lack of a developed record and the fact that the district court has not yet expressed its views on this motion" as added reason to decline to address IMB's argument on the merits. Id. The jurisdictional question over IMB can now be resolved, in light of this Court's decision affirming the lack of personal jurisdiction over SAB.

The government concedes that personal jurisdiction extends to IMB only if (1) the government makes a prima facie case for jurisdiction over SAB and if (2) the government can establish alter ego liability. See Pleasant St. I, 960 F.2d at 1091 ("if [subsidiary] PSC's contacts can be attributed to [parent company] ITD, then the jurisdictional hurdle can be vaulted"); Donatelli, 893 F.2d at 466 ("Since the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in all fairness, be within the state court's jurisdictional reach."). Since the government was unable to make the case for jurisdiction over SAB, the first "if" has not been satisfied. Therefore, personal

jurisdiction cannot extend to IMB.  We thus affirm the district court's dismissal of the case against IMB.

## IV.

For the foregoing reasons, we agree with the district court's dismissal of the case against SAB and IMB for lack of personal jurisdiction.

**<u>Affirmed</u>**.

**(Dissenting follows)**

**LIPEZ, <u>Circuit Judge</u>, dissenting**. The majority concludes that the district court did not abuse its discretion in denying jurisdictional discovery. I respectfully disagree with that conclusion, and therefore dissent. My disagreement with the majority stems in large part from the majority's treatment of <u>Calder</u> v. <u>Jones</u>, 465 U.S. 783 (1984). In assessing whether the government's tort claims arise out of or relate to SAB's contacts with the forum, the majority states that, "since <u>Calder</u>'s 'effects' test is relevant only to the purposeful availment prong, it cannot be used to strengthen the government's relatedness showing." That reasoning cannot be squared with <u>Calder</u>'s holding that jurisdiction can be "based on" the in-forum effects of the defendant's out-of-forum activity. 465 U.S. at 787. Under <u>Calder</u>, those effects are jurisdictional contacts in their own right, relevant to the relatedness requirement.

Although I agree with the majority that the government has not yet made out a prima facie case for specific jurisdiction, I believe that the government's effects argument creates a "colorable" case for specific jurisdiction with respect to its tort claims against SAB. Accordingly, I conclude that the district court abused its discretion in summarily denying the government's request for jurisdictional discovery on the ground that the government's case for personal jurisdiction is "bootless."

**I.**

-34-

My disagreement with the majority over the import of Calder leads me to a different view on the question of jurisdictional discovery. Thus, before turning to the discovery question, I first must address Calder itself, and its implications for the government's case for specific jurisdiction.

**A.  The Jurisdictional Relevance of Effects**

The dispute in Calder arose out of an allegedly libelous article published in the National Enquirer about Shirley Jones, a well-known California entertainer. Jones sued the Enquirer, Ian Calder, its president and editor, and John South, the reporter who wrote the offending article. Calder and South were both Florida residents, and it was undisputed that the article had been written, researched, and edited in Florida. Indeed, Calder never even called California in connection with the article: "all of his acts with reference to [the Jones] article apparently were performed in Florida." Jones v. Calder, 187 Cal. Rptr. 825, 829 (Cal. Ct. App. 1982).

The California Court of Appeal concluded that "[t]he fact that the actions causing the effects in California were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects." Calder, 465 U.S. at 787. The Supreme Court agreed, noting its "approval of the 'effects' test employed by the California court." Id. at 787 n.6.

That test was drawn from § 37 of the Restatement (Second) of Conflicts of Laws, which provides:

> A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state make the exercise of jurisdiction unreasonable.

As the language of the Restatement test suggests, its elements mirror those of our traditional specific jurisdiction inquiry. The first clause, authorizing jurisdiction over "one who causes effects in the state by an act done elsewhere," establishes that in-forum effects are relevant contacts for the jurisdictional analysis. The second clause then limits the exercise of jurisdiction to cases in which there is a sufficient nexus between the defendant's forum contacts (here, the in-forum effects) and the plaintiff's cause of action. That clause correlates to the relatedness requirement for specific jurisdiction, which is satisfied when the plaintiff's cause of action either "aris[es] out of or relate[s] to the defendant's contacts with the forum." Helicópteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984) (emphasis added). We have said that "we think it significant that the constitutional catchphrase is disjunctive in nature, referring to suits arising out of or relating to in-forum activities. We believe that this added language portends added flexibility and signals a relaxation of the applicable standard."

-36-

<u>Ticketmaster-NY, Inc.</u> v. <u>Alioto</u>, 26 F.3d 201, 206 (1st Cir. 1994) (citations and internal quotation marks omitted).  There is no reason to depart from our usual understanding of the relatedness inquiry in this case.  Therefore, although the Restatement uses "arising out of" language to describe its relatedness requirement, the requirement also can be satisfied by a showing that the plaintiff's cause of action "relates to" the in-forum effects of the defendant's activity.

The final clause of the effects test adds a proviso, forbidding effects-based jurisdiction in cases where "the nature of the effects and of the individual's relationship to the [forum] make the exercise of jurisdiction unreasonable."  <u>Restatement (Second) of Conflict of Laws</u>, § 37.  Prior to <u>Calder</u>, the Supreme Court had explained that the general "reasonableness" inquiry mandated by the effects test overlaps in large part with the purposeful availment inquiry.  <u>See</u> <u>Kulko</u> v. <u>Superior Court</u>, 436 U.S. 84 (1978).  Thus, effects-based jurisdiction is "unreasonable" under the Restatement test where the defendant has not intentionally reached out to the forum state in some way, so that he or she reasonably could anticipate being haled into court there.  <u>See</u> <u>id.</u> at 96-98.

The circumstances of <u>Calder</u> easily satisfied the first two clauses of the Restatement test.  The article, written by defendants Calder and South in Florida, had caused harmful effects in the forum state; as the Court observed, "the brunt of the harm [to Jones], in

-37-

terms both of [her] emotional distress and the injury to her professional reputation, was suffered in California." Calder, 465 U.S. at 789. Jones's cause of action arose out of those effects. See id. at 787. Thus, as the majority explains, since the in-forum effects of the Calder defendants' actions "were clearly related to the plaintiff's defamation suit, . . . the Supreme Court did not need to address the relatedness prong before proceeding to the purposeful availment inquiry."

The Court began that inquiry by distinguishing the defendants' situation from that of a hypothetical welder who works on a boiler in Florida that later explodes in California. See id. at 789. The welder obviously can "foresee" that the boiler might make its way to California and cause harmful effects there. Id. Yet, the Court observed, it may well be unfair to subject the welder to jurisdiction in California when he "has no control over and derives no benefit from his employer's sales in that distant State." Id.

Unlike the unfortunate welder, Calder and South were "not charged with mere untargeted negligence." Id. Rather, the Court emphasized, "their intentional, and allegedly tortious, actions were expressly aimed at the forum state." Id. The allegedly libelous story "concerned the California activities of a California resident" whose "career was centered in California." Id. at 788-89. Moreover, the defendants knew the article "would have a potentially devastating

impact" on Jones, and that she would suffer "the brunt of the injury" in California, where she lived and worked. Id. at 789-90. In short, California was "the focal point both of the story and of the harm suffered." Id. at 789. Thus, the defendants "must 'reasonably anticipate being haled into court there,'" id. at 790 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 287, 297 (1980)), and jurisdiction reasonably could be "based on the 'effects' of [defendants'] Florida conduct in California," id. at 789.

### B. The Majority's Reading: Calder and Related Contacts

Given Calder's focus on the reasonableness of exercising jurisdiction on the basis of effects, it is easy to understand the majority's assertion that Calder "is a gauge for purposeful availment." When a plaintiff seeks to base jurisdiction on the in-forum effects of the defendant's activity elsewhere, the case likely will turn on such questions as whether the defendant's allegedly tortious conduct was intentionally and "expressly aimed" at the forum state, and whether the "brunt of the harm" was felt there. Calder, 465 U.S. at 789. Those inquiries properly fall under the purposeful availment prong because they are designed to determine whether the defendant intentionally reached out to cause harm in the forum state.[8]

---

[8] Calder clarified that the purposeful availment requirement is met whenever the defendant intentionally reaches out to the forum in some way, whether it is seeking benefits or causing harm. The Court reaffirmed that point in Burger King Corp. v. Rudzewicz, explaining

Contrary to the conclusion of the majority, however, it does not follow that Calder "is relevant only to the purposeful availment prong [and so] cannot be used to strengthen the government's relatedness showing." As I have explained, the Restatement "effects" test approved in Calder includes a relatedness element. It permits a state to exercise effects-based jurisdiction only when the plaintiff's claims arise out of or relate to the in-forum effects of the defendant's acts. See Restatement (Second) of Conflicts of Laws, § 37; Calder, 465 U.S. at 787 (noting that effects-based jurisdiction was proper where Jones's claims arose out of the California effects of the defendants' actions).

The majority does not suggest that the government's claims against SAB are not related to the in-forum effects of SAB's allegedly tortious activity. Accordingly, when it says that the effects test "cannot be used to strengthen the government's relatedness showing," the majority must mean that, under Calder, the in-forum effects are not jurisdictional contacts themselves, but merely additional evidence that the defendants acted purposefully. Based on that interpretation of

---

that due process requires that individuals have "fair warning" that their activities might subject them to jurisdiction in the forum, and that the fair warning requirement is satisfied if the defendant "'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities.'" 471 U.S. 462, 472 (1985) (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984); Helicópteros, 466 U.S. at 414 n.8).

Calder, the majority states that the relatedness inquiry can be satisfied only when "the defendant's in-forum conduct caused the injury or gave rise to the cause of action."

However, the effects test adopted in Calder explicitly authorizes jurisdiction based on the in-forum effects of "an act done elsewhere." Restatement (Second) of Conflict of Laws, § 37. Those effects are relevant jurisdictional contacts, apart from any link between the plaintiff's tort claims and the defendant's "in-forum conduct." Thus, in Calder, the Court did not rely on the presence of physical, mail, or telephone contacts between the defendants and the forum. Instead, it held that jurisdiction was proper "based on 'effects' of [defendants'] Florida conduct in California." Calder, 465 U.S. at 789; see also Hugel v. McNell, 886 F.2d 1, 4 (1st Cir. 1989) (explaining that, under Calder, "[t]he knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions"); Haisten v. Grass Valley Med. Reimbursement Fund, Ltd., 784 F.2d 1392, 1397 (9th Cir. 1986) (noting that in Calder "the Court . . . allowed the exercise of jurisdiction over a defendant whose only 'contact' with the forum state [was] the 'purposeful direction' of a foreign act having effect in the forum state" (first emphasis added)). It is difficult to understand how jurisdiction could have

-41-

been permissible in those circumstances were the in-forum effects of acts done elsewhere not themselves contacts.

Indeed, the majority's methodology would seem to compel a result contrary to that reached in Calder. On the majority's understanding, "the effects test . . . is to be applied only after the relatedness prong has been satisfied." That creates a quandary for the plaintiff whose cause of action arises out of or relates to the in-forum effects of out-of-forum activity. If those effects are off-limits during the relatedness inquiry, and if that inquiry must be completed before the effects can be taken into account under the purposeful availment analysis, then the plaintiff never will be able to establish jurisdiction "based on" those effects. Calder, therefore, is a dead letter. The only cases in which in-forum effects could be considered are those in which jurisdiction might just as easily be based on some other forum contacts.

The majority offers two bases for its reading of Calder. First, it emphasizes that in Noonan v. Winston Co., 135 F.3d 85, 90 (1st Cir. 1998), we said that Calder "adopted an effects test for determining purposeful availment in the context of defamation cases." It is important to see that statement in context:

> The decisive due process issue in this [defamation] case is whether the defendants' activities satisfy the purposeful availment requirement. Plaintiffs correctly draw our attention to Calder v. Jones, in which the

-42-

> Supreme Court adopted an effects test for
> determining purposeful availment in the context
> of defamation cases.

Id. (internal citation omitted).  Noonan cannot bear the weight the majority gives it.  Calder did establish a test for determining purposeful availment in defamation cases.  The majority's reading depends on the entirely different point that Calder did not also establish that jurisdiction can be based on the in-forum effects of out-of-forum activity when such effects relate or give rise to the cause of action.  Noonan did not discuss relatedness at all, and so provides no support for the majority's restrictive interpretation of Calder.

Second, the majority points out that "we have wrestled before with [the] issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative." Mass. Sch. of Law v. Amer. Bar Ass'n, 142 F.3d 26, 35-36 (1st Cir. 1998).  In further support of that point, the majority cites Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7 (1st Cir. 1986), and Sawtelle v. Farrell, 70 F.3d 1381 (1st Cir. 1995), in which we held that New Hampshire could not exercise jurisdiction over foreign law firms based on allegedly negligent acts committed outside the state.[9] We discussed those cases in Massachusetts School of Law, and

_____

[9] We reasoned in Kowalski and Sawtelle that the effects of an injury are not the same thing as the injury itself.  See Kowalski, 787 F.2d at 11; Sawtelle, 70 F.3d at 1390.  I address the distinction between

-43-

concluded that, "[j]ust as the New Hampshire effects of [out-of-state] negligence, without more, could not sustain an action in New Hampshire against the negligent actor, see Kowalski, 787 F.2d at 11, so too the Massachusetts effects of the [defendants'] [out-of-state] actions, without more, fail to sustain an action in a Massachusetts court." 142 F.3d at 36 (also citing Sawtelle, 70 F.3d at 1394).

We did not mention Calder – much less rely on it – in Massachusetts School of Law, Kowalski, or Sawtelle. Nevertheless, our holdings in those cases are consistent with the effects test that I have described. Under Calder, in order for jurisdiction to be based solely on the in-forum effects of the defendant's activity, the plaintiff must show that the defendant acted "for the very purpose" of causing harmful effects in the forum. Lake v. Lake, 817 F.2d 1416, 1422 (9th Cir. 1987); Restatement (Second) of Conflict of Laws, § 37 cmt. e ("When the act was done with the intention of causing the particular effects in the state, the state is likely to have judicial jurisdiction though the defendant had no other contact with the state."). No such showing was made (or even attempted) in Massachusetts School of Law, Sawtelle, and Kowalski. In those cases, therefore, effects-based jurisdiction would have been "unreasonable" under the Restatement test, not because the in-forum effects were not contacts, but because the "nature of the effects" was such that

injury and effects below, as part of the purposeful availment analysis.

-44-

jurisdiction could not rest on them alone.  Restatement (Second) of Conflict of Laws, § 37; see also Calder, 465 U.S. at 789-89; Kulko, 436 U.S. at 96-97.

To be sure, in-forum effects that lack the requisite intentionality are still jurisdictional contacts that must be taken into account in the overall analysis.  Calder compels that conclusion, and our cases do not suggest otherwise.  But other contacts between the defendant, the forum, and the litigation are necessary in order to render the exercise of jurisdiction reasonable.  See Restatement (Second) of Conflict of Laws, § 37 cmt. e ("The fact that the effect in the [forum] was . . . foreseeable will not itself suffice to give the [forum] judicial jurisdiction over the defendant."); Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 869 (5th Cir. 2001) (explaining that "the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum" (internal quotation marks omitted)).

Here, the majority does not dispute that SAB's actions caused harmful effects – the loss of money – in the United States. Nor does it dispute that those harmful effects are related to the government's claims of wrongful conversion and unjust enrichment.  The crucial question, therefore, is whether SAB's actions satisfy the purposeful availment inquiry; that is, whether SAB "expressly aimed" its allegedly

tortious activity at the United States with the knowledge that "the brunt of the harm" would be felt there.  Calder, 465 U.S. at 789.

###    C.  Purposeful Availment

We have said that Calder imposes a two-part test for purposeful availment, requiring a plaintiff to show (1) that it felt the injurious effects of a defendant's tortious act in the forum, and (2) that the defendant's act was "calculated to cause injury" to the plaintiff there.  Noonan, 135 F.3d at 90 (citing Calder, 465 U.S. at 791).  The government easily satisfies the first prong.  The loss of the forfeit $7 million to the United States government as a result of SAB's alleged conversion and unjust enrichment necessarily had injurious effects that were felt in the United States.  In Swiss II, we concluded that the "legal injur[ies] occasioned by" the torts of conversion and unjust enrichment occurred in Antigua, where the conversion and enrichment took place.  United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 37 (1st Cir. 1999).  Nevertheless, we acknowledged that, "upon the occurrence of the alleged conversion and the consequent unjust enrichment, the United States felt the effects of a tortious injury in the [United States]."  Id. at 38.

The majority suggests that the fact that the government's injury occurred in Antigua distinguishes this case from Calder.  Cf Kowalski, 787 F.2d at 11 (distinguishing between injury and effects for purposes of the New Hampshire long-arm statute, which requires that the

-46-

plaintiff's injury occur in the forum); Sawtelle, 70 F.3d at 1390 (explaining that, in Kowalski, "we rejected the plaintiff's contention that, because the 'effects' of the [defendant law] firm's negligence were felt in New Hampshire, the law firm had caused an injury there by conduct directed at that forum. . . . The injury, if any, occurred in Massachusetts"). Yet here, as in Calder, the plaintiff suffered "the brunt of the harm" in the forum. Calder, 465 U.S. at 789. That similarity suggests that the outcome of our jurisdictional analysis should not be different in this case simply because the injury caused by libel is deemed to occur wherever the libelous material is circulated, while the injury of conversion is deemed to occur where the conversion took place. Such formalistic distinctions can be helpful in cases like Swiss II, where the applicable state long-arm statute requires an in-forum injury as a prerequisite to jurisdiction. See Swiss II, 191 F.3d at 38 (applying § 3(d) of the Massachusetts long arm statute, which authorizes jurisdiction over one who, inter alia, causes "tortious injury in this commonwealth"); see also Kowalski, 787 F.2d at 11 (applying similar New Hampshire statute). Our inquiry here is not so rigidly confined, where strict rules give way to "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Given the flexible nature of our due process analysis, we should hesitate before adopting a bright-line rule that in-forum

effects do not constitute jurisdictional contacts unless they also can be deemed an "injury."

That is not to say that the situs of the plaintiff's injury is irrelevant to the jurisdictional analysis. In cases where the injury occurred outside the forum, the plaintiff may find it difficult to satisfy the second prong of the Calder test, which requires a showing that the defendant's act was "calculated" to cause the harmful effects in the forum. That inquiry is designed to determine whether the nature of the effects is such that jurisdiction reasonably can be based on them alone, and it is here that the government's prima facie case for jurisdiction falters. The government argues that "SAB knew that its intentional conduct in Antigua would cause injury to the United States government." That is not enough. The government must show that SAB's actions were "expressly aimed" at the United States as a forum. Calder, 465 U.S. at 789 (distinguishing the case of the negligent welder); Wein Air Alaska, Inc. v. Brandt, 195 F.3d 208, 212 (5th Cir. 1999) ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."); cf. Burger King, 471 U.S. at 474 ("Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish [minimum] contacts there . . . , the Court has consistently held that this kind of foreseeability is not a 'sufficient

benchmark' for exercising personal jurisdiction." (footnote omitted) (quoting <u>World-Wide Volkswagen</u>, 444 U.S. at 295)).

The government argues that SAB's intentional defiance of the preliminary forfeiture order issued by the district court constitutes such express aiming.  The forfeiture order identified the forfeited property as "funds which were deposited into the Swiss American Bank, Ltd., and the Swiss American National Bank in St. Johns, Antigua during the time period September 1985 through June 23, 1987."  It is undisputed that SAB was aware of the order, and responded by writing to the district court to inform it that the Antiguan government had frozen Fitzgerald's accounts.  However, the fact that SAB had notice that the money it took for itself belonged to the United States government does not, in itself, make the United States <u>as a forum</u> the focal point of SAB's allegedly tortious activity.  As the Third Circuit has observed, <u>Calder</u> did not "carve out a special intentional torts exception to the traditional specific jurisdictional analysis, so that a plaintiff could always sue in his or her home state."  <u>IMO Indus., Inc.</u> v. <u>Kiekert AG</u>, 155 F.3d 254, 265 (3d Cir. 1998).  Therefore, it cannot be enough that the defendant knew when it acted that its victim lived in the forum state.  <u>See</u> <u>id.</u> ("Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet [the 'expressly aimed'] requirement."); <u>accord</u> <u>Southmark Corp.</u> v. <u>Life Investors, Inc.</u>, 851

-49-

F.2d 763, 773 (5th Cir. 1988) (concluding that the location of the plaintiff's principal place of business in the forum was a "mere fortuity," insufficient to show that the defendant expressly aimed its actions at the forum); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir. 1997) (finding no jurisdiction where the defendant knew that its acquisition of the plaintiff's trade secrets would result in lower sales for the plaintiff, but did not "manifest behavior intentionally targeted at and focused on" the forum state). Something more is needed to show that SAB's actions were "purposefully directed" or "expressly aimed" at the United States.

Because the government has not demonstrated that SAB's actions were "intentionally targeted at and focused on the forum," IMO Indus., 155 F.3d at 263, the in-forum effects of those actions do not provide a sufficient basis for the exercise of jurisdiction. Although those effects qualify as a relevant (and, as I have explained, related) contact between SAB and the United States as a forum, that contact is too "attenuated" to satisfy the requirement of purposeful availment. Burger King, 471 U.S. at 475 (internal quotation marks omitted). In the words of the Restatement, "the nature of the effects and of the [defendant's] relationship to the [forum] make the exercise of [effects-based] jurisdiction unreasonable." Restatement (Second) of Conflict of Laws, § 37. Thus, the government must demonstrate that SAB had other contacts with the forum "such that the maintenance of the

suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

### D.  **The Gestalt Factors**

Although I have concluded that the in-forum effects of SAB's activity lack the requisite purposefulness to support jurisdiction on their own, my inquiry does not end there.  The Supreme Court has laid out five criteria for assessing the overall reasonableness of an exercise of personal jurisdiction. See Burger King, 471 U.S. at 476-77.  In close cases, those criteria – which we have termed the "gestalt factors," see Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 150 (1st Cir. 1995) – "may tip the constitutional balance." Nowak v. Tak How Inv., Inc., 94 F.3d 708, 717 (1st Cir. 1996); accord Burger King, 471 U.S. at 477 (explaining that gestalt factors "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required").  Even if they do not alter the constitutional balance, the gestalt factors can be important in determining whether the plaintiff's jurisdictional showing is "colorable" enough to support a request for jurisdictional discovery.  Therefore, the jurisdictional inquiry is incomplete in this case without consideration of the gestalt factors.

Those factors are "the plaintiff's interest in obtaining convenient and effective relief; the burden imposed upon the defendant

-51-

by requiring it to appear; the forum's adjudicatory interest; the [forum] judicial system's interest in the place of adjudication; and the common interest of all affected sovereigns . . . in promoting substantive social policies." Donatelli v. Nat'l Hockey League, 893 F.2d 459, 465 (1st Cir. 1990). We refer to them as the "gestalt" factors "because, in any given case, they may neither be amenable to mechanical application nor be capable of producing an open-and-shut result. Their primary function is simply to . . . put[] into sharper perspective the reasonableness and fundamental fairness of exercising jurisdiction." Foster-Miller, Inc., 46 F.3d at 150.

In assessing the burden of appearance on the defendant, we have considered whether the defendant does business with the forum, Nowak, 94 F.3d at 718, and the distance between the defendant's place of business and the forum, Ticketmaster-NY, Inc., 26 F.3d at 210. As the majority has explained, the record does not show that SAB does business in the United States. In addition, the distance from Antigua to the United States is "appreciable." Id. For these reasons, the burden on SAB of litigating in a United States district court in Massachusetts is a relatively heavy one. See Asahi Metal Indus. Co., Ltd. v. Superior Court, 480 U.S. 102 (1987). "This Court has recognized, however, that it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction." Nowak, 94 F.3d at 718. Thus, for this factor to be significant, "the defendant must

demonstrate that exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." Id.; see also Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994). There is nothing to suggest an especially onerous burden here.

Moreover, as the Supreme Court said in Asahi, "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on [an] alien defendant." 480 U.S. at 114. In Pleasant St. II, we found that the burden of requiring a Scottish corporate defendant to appear in Massachusetts was "substantially outweighed by Massachusetts' interest in adjudicating this dispute and plaintiffs' interest in obtaining convenient and effective relief." United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 987 F.2d 39, 46 (1st Cir. 1993) ( Pleasant St. II). This case is similar.

Our cases recognize that courts "must accord deference to the plaintiff's choice of forum." Nowak, 94 F.3d at 718. As in Nowak, a suit involving a Hong Kong defendant, "it is obvious that a Massachusetts forum is more convenient" than a forum in Antigua. Id. Moreover, the United States clearly has a strong interest in the enforcement of its forfeiture laws. The judicial system's interest in obtaining the most effective resolution of the controversy "also favors the retention of jurisdiction over this dispute." Pleasant St. II, 987 F.2d at 46. The district court has an interest in ensuring that its

-53-

own forfeiture order is satisfied and in litigating all claims arising out of Fitzgerald's criminal proceeding in Massachusetts. See Keeton, 465 U.S. at 777 (explaining that the forum has an interest in litigating all claims arising out of the underlying libel case).

In discussing the final gestalt factor relating to sovereignty, the Supreme Court has said that when the defendant is a foreign entity, the sovereignty factor of the reasonableness analysis "calls for a court to consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction" by the court. Asahi, 480 U.S. at 115. In this case, there is a potentially significant sovereignty issue that the district court did not reach, and which the parties do not discuss in their briefs. In a January 29, 1998 letter, the Antiguan Cabinet Secretary informed the United States that it froze Fitzgerald's funds in 1990 "because of evidence that the monies were the proceeds of illegal conduct." The letter also states: "In a judgement handed down from our High Court dated December 20, 1990, it was found that Fitzgerald was not the owner of these funds." The letter then says that the Antiguan government discussed the disposition of the funds with SAB after the Massachusetts district court issued its forfeiture order, and that "acting in the public interest of Antigua and Barbuda," the Antiguan government "released the freeze order on the funds and

approved the disposition of the funds in a manner agreed by the Banks and approved by the Government."

While SAB and IMB, not the government of Antigua, are the defendants in this case, the fifth gestalt factor requires us to take into account the sovereignty concerns raised by this letter. The Antiguan government has claimed $5 million of the forfeited funds, and cites in support of its decision to do so a 1990 order of the Antiguan High Court. Although that claim does not affect the $2 million allegedly converted by SAB, it is an important consideration for the remaining $5 million. Therefore, at least without further briefing by the parties on these sovereignty concerns, I cannot conclude that the government's showing under the gestalt factors is strong enough to "tip the constitutional balance" here. Nowak, 94 F.3d at 717.[10] Nevertheless, the consideration of these gestalt factors reinforces my conclusion that the government's case for specific jurisdiction was colorable enough to merit the jurisdictional discovery denied by the district court. In my view, that denial was plainly wrong, and an abuse of discretion.

## II.

The district court briskly denied the government's request for jurisdictional discovery, explaining that the government's showing

---

[10] It bears emphasis that the weighing analysis should be done in the first instance by the district court, which should not have ended its specific jurisdiction inquiry with the relatedness element.

was "so bootless . . . that it has made no colorable claim sufficient to entitle it to any further discovery." <u>United States</u> v. <u>Swiss Am. Bank, Ltd.</u>, 116 F. Supp. 2d 217, 225 (D. Mass. 2000). That determination is based on a legal misunderstanding of the import of <u>Calder</u>, and therefore constitutes an abuse of discretion. <u>Koon</u> v. <u>United States</u>, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").

We have held consistently to the rule that a plaintiff may take jurisdictional discovery if its claim is "colorable." <u>Sunview Condo. Ass'n</u> v. <u>Flexel Int'l, Ltd.</u>, 116 F.3d 962, 964 (1st Cir. 1997). The "colorable" or "not frivolous" standard for obtaining jurisdictional discovery requires some showing that discovery is needed or likely to be useful. However, that showing is significantly lower than the prima facie showing of jurisdiction, which requires the plaintiff "to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution."[11] <u>Pleasant St. II</u>, 987 F.2d at 44 (internal quotation marks omitted). The jurisdictional discovery question, by contrast, is whether the government's showing of minimum contacts falls

[11] The government argues that our admonition in <u>Swiss II</u>, 191 F.3d at 45, that "[a] timely and properly supported request for jurisdictional discovery merits solicitous attention," further softens the "colorable" standard. That is not so. Rather, the "timely" and "properly supported" language reflects our statements elsewhere that a plaintiff must be "diligent" to merit discovery. <u>See</u>, <u>e.g.</u>, <u>Sunview Condo.</u>, 116 F.3d at 964.

so far short that discovery is "unnecessary (or, at least, is unlikely to be useful) in regard to establishing the essential jurisdictional facts." Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 38 (1st Cir. 2000).

Our approach to jurisdictional discovery originates with Surpitski v. Hughes-Keenan Corp., 362 F.2d 254, 255-56 (1st Cir. 1966). In that case, we held that the district court should have allowed discovery before ruling on a motion to dismiss for lack of personal jurisdiction where the plaintiff "had at least made good headway, and shown his position not to be frivolous." Id. at 255. While Surpitski is an older case, we have cited and reaffirmed its discovery-friendly holding numerous times. See Swiss II, 191 F.3d at 46; Sunview Condo., 116 F.3d at 964; Pleasant St. II, 987 F.2d at 48 n.18; Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 681 (1st Cir. 1992); Whitaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1086 (1st Cir. 1973). In Sunview Condo. we explained that "a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." 116 F.3d at 964. Jurisdictional discovery is appropriate "where the plaintiff had been diligent and was somewhat unfamiliar with his adversary's business practices," Boit, 967 F.2d at 681, and "where

complex factual matters are in question," Whittaker Corp., 482 F.2d at 1086.

Other circuits similarly allow for discovery when a diligent plaintiff with a colorable but undeveloped case requests it. See Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 425 (D.C. Cir. 1991) ("As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction."); Butcher's Union Local No. 498 v. SDS Inv., Inc., 788 F.2d 535, 540 (9th Cir. 1986) ("Discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." (internal quotation marks omitted)); Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances, 723 F.2d 357, 362 (3d Cir. 1983) ("Where the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden."); Wyatt v. Kaplan, 686 F.2d 276, 283 (5th Cir. 1982) ("In an appropriate case, we will not hesitate to reverse a dismissal for lack of personal jurisdiction, on the ground that the plaintiff was improperly denied discovery."); see also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1351 at 256-59 (2d ed. 1990) ("In particularly complex cases, . . . it may be desirable to hold in abeyance a decision on a motion to

dismiss for lack of personal jurisdiction.  Doing so will enable the parties to employ discovery on the jurisdictional issue, which might lead to a more accurate judgment than one made solely on the basis of affidavits.").  In sum, "[n]umerous cases have sustained the right of plaintiffs to conduct discovery before the district court dismisses for lack of personal jurisdiction."  Renner v. Lanard Toys Ltd., 33 F.3d 277, 283 (3d Cir. 1994).[12]

In light of this right, several appellate courts have found, as we did in Surpitski, that district courts erred in denying discovery in cases in which plaintiffs did not allege sufficient facts to make a prima facie case for personal jurisdiction.  In Renner, for example, the Third Circuit concluded that discovery should have been granted where the record was "ambiguous" and "incomplete."  Id. at 283.  In Edmond, the lower court's decision to deny discovery was error because the plaintiffs' allegations were "far from conclusory." 949 F.2d at 425.  In Skidmore v. Syntex Labs., Inc., 529 F.2d 1244 (5th Cir. 1976), the court said that discovery should have been allowed because the plaintiff's attorney was not at fault for having failed to discover the requisite jurisdictional facts earlier.  Id. at 1248.

---

[12] But see Jazini v. Nissan Motor Co., 148 F.3d 181, 186 (2d Cir. 1998) ("Since the Jazinis did not establish a prima facie case that the district court had jurisdiction over Nissan Japan, the district court did not err in denying discovery on that issue.").

-59-

Here, the district court based its discretionary denial of discovery on an error of law – its failure to recognize the import of Calder and the need to evaluate more fully the government's case for jurisdiction.  See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 86 (1st Cir. 1998) (mistaken application of law constitutes abuse of discretion); United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998) (per se abuse of discretion occurs when district court commits error of law).  Assessed properly, the government's case is colorable.  As I have explained, Calder held that the in-forum effects of intentionally tortious conduct are a significant jurisdictional contact in their own right.  Therefore, when viewed through the prism of the effects test that Calder endorsed, the government's tort claims are related to SAB's contacts with the forum. It is under the purposeful availment prong – which the district court never even considered – that the government's showing falls short. Because Antigua was the legal situs of the government's injury, it is not immediately obvious that SAB expressly aimed its tortious activity at the United States as a forum.  Thus, in order to establish a prima facie case, the government cannot rely solely on the in-forum effects of SAB's actions; it must demonstrate the existence of other contacts between SAB and the forum so that the exercise of jurisdiction over SAB is fundamentally fair.

The government points out that its ability to show more contacts between SAB and the United States, under either a general or specific theory of personal jurisdiction, has been hampered by the bank's privately held status and by Antigua's banking secrecy laws. Accordingly, the government's failure to establish the necessary contacts does not necessarily indicate that those contacts do not exist. Rather, it may mean simply that the government has not been able to learn of them without the benefit of discovery. For example, the business contacts between SAB and American companies suggest that there may be more such contacts that the government might be able to discover if it had access to the bank's records. Similarly, with the benefit of discovery, the government might find out that SAB sent letters or made phone calls to Fitzgerald in the United States, or even sent representatives to meet with him here. Indeed, the government's investigator has already found phone records indicating that Herrington placed calls to Boston during the period in which Fitzgerald was setting up his SAB accounts. If the government had access to the bank's records, it might be able to show that Fitzgerald received those calls, thereby strengthening both the relatedness and purposeful availment elements of its case for specific jurisdiction.

Our precedent in Pleasant St. II is instructive here. The proceedings that led to that decision began when the district court entered an injunction and a contempt order against a Scottish

corporation.  See 987 F.2d at 42.  During the pendency of the corporation's appeal, the plaintiff proceeded with discovery, but because of the timing of the filings, the discovered material was not part of the record on appeal.  Id.  We thus vacated the injunction and contempt order for lack of personal jurisdiction in Pleasant St. I unaware of the jurisdictional contacts that the plaintiff had discovered.  United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080 (1st Cir. 1992).  On remand, the district court granted the defendant's motion to dismiss.  The plaintiffs appealed for a second time, and in Pleasant St. II we reversed the dismissal in light of the new facts learned through discovery.  We explained:

> Under the facts of this case, the incomplete nature of the record prevented any sort of conclusive determination on the personal jurisdiction issue at the time 163 Pleasant St. I was handed down.  The jurisdictional deficiency which informed the holding in our previous opinion did not stem from either a settled factual predicate or legally insufficient allegations, but from perceived voids in the evidentiary landscape.

Id. at 47.  Noting that before Pleasant St. I, "no discovery directed at filling those voids took place," id., we continued:

> if, on the record before it, the district court had decided the personal jurisdiction issue adversely to plaintiffs without at least affording them the opportunity to . . . request discovery, we almost certainly would have declined to affirm the district court's judgment and held the ruling to be an abuse of the court's discretion.

-62-

Id. at 48 n.18. In this case, as in the Pleasant St. litigation, the "incomplete nature of the record" rather than a "settled factual predicate or legally insufficient allegations" is the reason that the government cannot make out a prima facie case for jurisdiction. Id. at 47.

SAB launches two additional attacks on the government's contention that it is entitled to discovery. First, it argues that the care that a court must show in extending its authority over foreign nationals weighs against allowing the government to take discovery. Two circuits have taken this consideration into account in declining to reverse lower court decisions to disallow discovery. See Cent. States, S.E. and S.W. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d, 934, 947 (7th Cir. 2000) ("[I]mposing such burdensome, wide-ranging discovery against defendants from a foreign nation is not appropriate at a stage where the district court is trying to determine whether it has any power over the defendants."); Jazini v. Nissan Motor Co., 148 F.3d 181, 185-86 (2d Cir. 1998) (declining to allow plaintiff who made "conclusory non-fact-specific jurisdictional allegations" to obtain discovery because to do so "would require the federal courts to conduct substantial jurisdictional discovery over foreign corporations – a practice in which they have not hitherto engaged").

Weighing sovereignty concerns when the plaintiff has not yet shown that the exercise of jurisdiction is proper is indeed a delicate matter. We have urged courts to "exercise even greater care before exercising personal jurisdiction over foreign nationals." Noonan, 135 F.3d at 93. But our caution does not extend so far as to prevent discovery in a case such as this, where discovery is the only means of filling in the missing pieces of a jurisdictional showing that is more than "colorable."

The bank argues further that the government has not been a "diligent" plaintiff, as Surpitski and later cases define the term, because it failed to (1) adequately pursue the contacts that it was authorized to investigate pursuant to an Asset Discovery Order issued in the criminal case against Fitzgerald; (2) make adequate use of its interviews with Fitzgerald and Herrington; and (3) present the district court with a rationale for why discovery would further its case.

The Asset Discovery Order was issued under statutes that authorize discovery "to facilitate the identification and location of property declared forfeited." 21 U.S.C. § 853(m). SAB argues that the investigation undertaken pursuant to the Asset Discovery Order is the equivalent of discovery.[13] However, that Order only authorized

---

[13] SAB makes much of the district court's statement that the government was not entitled "to any further discovery." Swiss III, 116 F. Supp. 2d at 225. I assume that the court's use of the word "further" simply refers to the government's investigation pursuant to the Asset Discovery Order.

discovery on the location of forfeitable assets. It was not a broad discovery tool. The Asset Discovery Order did not give the government access to SAB's records, which would appear to be the most obvious and promising source of information for the in-forum contacts the government needs to uncover. The government's investigation to this point has been hampered by its inability to explore these records, an obstacle that court-ordered discovery may (or may not) be able to remove.[14]

SAB also argues that the government had ample opportunity during the course of its investigations in its earlier prosecution of Fitzgerald and in the present case to obtain information relevant to SAB's forum contacts. Herrington, SAB points out, was interviewed at length by United States law enforcement officials in 1991 on the Isle of Man, and again by a government investigator after the initiation of proceedings against SAB. Fitzgerald, who had signed a plea and cooperation agreement with the government, presumably was available to provide information relevant to the jurisdictional issues. Given its access to such information, SAB contends, the government already has (or should have) discovered any contacts between SAB and the United States.

_____

[14] In its November 13, 1995 letter to the government, SAB said that the relevant records were destroyed in a hurricane. The government presumably would test this assertion if it were permitted to pursue jurisdictional discovery.

That argument is weakened significantly by the fact that Fitzgerald died shortly after the forfeiture order was entered in 1994 – before the events leading to the present controversy with the bank – and thus hardly could have aided the government in its attempts to uncover SAB's forum contacts. Herrington's 1991 interview likewise predated the forfeiture order and SAB's failure to comply. Accordingly, the government had no reason to press him regarding his or SAB's contacts with the United States.[15] Rather, the interview focused on facts relevant to the criminal charges of conspiracy and money laundering that later were brought against Fitzgerald and several other individuals. A government investigator did conduct a brief telephone interview with Herrington in 1998, after the government filed its complaint in the present action. But the apparent purpose of the interview was to gather information demonstrating IMB's control of SAB, not to determine the extent of the latter's forum contacts. In any event, that interview does not alter the government's status as a "stranger" to SAB within the meaning of Surpitski, 362 F.2d at 255, and

_____

[15] During that interview, Herrington was questioned about certain conversations with Fitzgerald in which he explained how Fitzgerald's anticipated deposits would be handled by SAB. Herrington indicated that all those conversations took place in Antigua. When asked whether "they all were face to face," he answered, "I, in the best of my knowledge, er, I never met Mr. Fitzgerald anywhere else but Antigua." The government interviewer did not ask Herrington whether he ever had contacted Fitzgerald by other means (for example by mail or telephone). There was no cause for the government to seek such details in the context of its 1991 investigation.

its progeny.  See, e.g., Whittaker Corp., 482 F.2d at 1086 (noting that jurisdictional discovery is appropriate where, inter alia, a party is "somewhat unfamiliar with his adversary"); Am. Express Int'l, Inc. v. Méndez-Capellán, 889 F.2d 1175, 1181 (1st Cir. 1989) (finding that parties were not "total stranger[s]" under Surpitski where they had a "long commercial relationship").  Indeed, the government's attempt to investigate only underscores that its relationship with the bank is an artifact of the forfeiture order.  While Fitzgerald had business dealings with SAB, and so was not a stranger to the bank, the government had no such ongoing relationship.

Finally, SAB argues that the government did not meet its burden of explaining to the district court the discovery sought and its value.  We have said that plaintiffs must "explain[] . . . how discovery, if allowed, would bear on the narrow jurisdictional issue." Dynamic Image, 221 F.3d at 39.  In opposing SAB's motion to dismiss, the government articulated the theories of general and specific jurisdiction that it was trying to prove and requested discovery of "any information regarding the existence, nature and scope of SAB contacts with the United States and United States persons."  As the majority points out, only on appeal did the government fully explain the types of contacts it hopes to discover.  The majority is correct to disregard specifics not presented below.  In my view, however, the government adequately explained to the district court the purpose of

its request for discovery, and its description of the contacts it hoped to find, while bare, meets the diligence standard.[16] After all, it is obvious that the government seeks evidence of physical, telephone, or mail contacts that are lacking in the current record.

In short, the government was a diligent plaintiff with a colorable claim. See Surpitski, 362 F.2d at 255; Sunview Condo., 116 F.3d at 965. If given the opportunity for appropriate discovery, it may well be able to make out a prima facie showing of specific jurisdiction. The district court did not recognize that possibility, however, because it refused to treat the in-forum effects of SAB's allegedly tortious activities as a jurisdictional contact. As a result, the court ended its specific jurisdictional analysis with the relatedness element, and summarily denied the government's request for discovery. Based as it was on a mistaken application of Calder, that denial was "plainly wrong," Crocker v. Hilton Int'l Barb., Ltd., 976

---

[16] SAB also faults the government for not renewing its motion for discovery before the bank filed its motion to dismiss following remand. The timing of the government's motion was proper. The Federal Rules of Civil Procedure do not provide an opposing party an explicit right to discovery in the motion to dismiss context, and the government could best explain to the court why it merited discovery in response to the arguments in SAB's motion to dismiss. The government preserved its request for discovery at each juncture of this case, in contrast to plaintiffs in other cases in which we have affirmed denials of requests for discovery. See Dynamic Image, 221 F.3d at 38; Sunview Condo., 116 F.3d at 964; Boit, 967 F.2d at 681.

F.2d 797, 801 (1st Cir. 1992).[17]  See Ruiz-Troche, 161 F.3d at 86.

Moreover, the denial caused the government "substantial prejudice."

Crocker, 976 F.2d at 801.  Without discovery, the government's case

ends.

### III.

Because I conclude that the district court erred in refusing

to allow jurisdictional discovery with respect to the government's

claims against SAB, I would also vacate the dismissal of the case

against IMB.  The district court determined that the government had

failed adequately to plead alter ego liability against IMB, and that it

had not established a sufficient basis for personal jurisdiction.  We

said in Swiss II that any ruling on alter ego liability was

---

[17] Contrary to the majority's suggestion, Crocker does not stand for
the proposition that the district court retains "broad discretion to
decide whether discovery is required" even if the plaintiff has been
diligent and has made a colorable claim for personal jurisdiction.
Crocker, 976 F.2d at 801.  In affirming the district court's denial of
discovery in Crocker, we did not so much as hint that the plaintiffs'
case was colorable, or that they had been diligent.  Instead, we simply
observed that discovery would have been futile, as the information the
plaintiffs sought would not have established that the defendant did
business in Massachusetts, as required by that state's long arm
statute.  See id.  In so doing, we noted the district court's broad
discretion in considering such questions, and explained that its
decision would be overturned "'only upon a clear showing of manifest
injustice, that is, where the lower court's discovery order was plainly
wrong and resulted in substantial prejudice to the aggrieved party.'"
Id. (quoting Santiago v. Fenton, 891 F.2d 373, 379 (1st Cir.1989)
(discussing standard for pre-trial, non-jurisdictional, discovery)).
Under our precedents dating back to Surpitski, a district court's order
would be "plainly wrong" if, without any reason to the contrary, it
denied jurisdictional discovery to a diligent plaintiff with a
colorable claim.

"premature," because the jurisdictional question should be resolved before reaching the merits of the case.  191 F.3d at 46 (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 118 (1998); Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574 (1999)).  The factors discussed in Swiss II continue to weigh in favor of that approach here.

As the majority explains, personal jurisdiction over IMB is contingent on the government's ability to make out a prima facie case for jurisdiction over SAB.  The district court ruled on the latter question without having allowed discovery against SAB to proceed.  I would remand the case so that such discovery could take place.  If the government, with the benefit of jurisdictional discovery, were able to establish a prima facie case of jurisdiction over SAB, the district court would then have to reassess the jurisdictional status of IMB and its alter ego ruling, as well as any discovery issues relating to IMB.